# IN THE SUPREME COURT OF IOWA

No. 11–1394

Filed March 22, 2013

**SHARECE RUCKER,**

Appellee,

vs.

**MIKE TAYLOR** and **SHERIE TAYLOR,**

Appellants.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Black Hawk County, David F. Staudt, Judge.

Interlocutory review from denial by the district court of motion to dismiss. **DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED; CASE REMANDED.**

Sarah M. Kouri of the Law Office of Scott J. Idelman, Des Moines, for appellants.

Hugh M. Field and Kate B. Mitchell of Beecher, Field, Walker, Morris, Hoffman & Johnson, P.C., Waterloo, for appellee.

**CADY, Chief Justice.**

In this interlocutory review, we must decide if good cause existed to excuse untimely service of process when the plaintiff, who failed to negotiate an enforceable agreement with the defendant's insurance representative to delay service, took no action to institute service of process of a lawsuit on the defendant within the time period required by Iowa Rule of Civil Procedure 1.302(5). The district court held good cause existed and denied defendant's motion to dismiss. We transferred the case to the court of appeals, and they affirmed. On further review, we affirm the decision of the court of appeals and the judgment of the district court. We remand for further proceedings.

## I. Background Facts and Proceedings.

Sharece Rucker was involved in an automobile accident with Mike and Sherie Taylor on January 15, 2009. Rucker sought legal assistance from attorney Hugh Field to pursue a claim against the Taylors to recover compensation for injuries she suffered from the accident. Field corresponded with a claims representative for the Taylors' insurance company for the purpose of settling the claim. The correspondence was primarily directed at updating the claims representative on Rucker's injuries and treatment status and was exchanged between April 3, 2009, and December 8, 2010.

On December 8, 2010, Field sent a formal settlement demand letter to the insurance company. On December 20, claims representative Brent Kneip responded to the letter with a counteroffer for settlement. On December 22, Field mailed a letter to Kneip stating in part:

> We are filing the enclosed Petition at Law for [Sharece Rucker], but will wait to serve it until our negotiations break down. I will give you 21 days thereafter to seek counsel and defend.

> I don't see any reason why we shouldn't be able to work out a settlement.

Kneip did not respond to the December 22 letter.

On December 29, Rucker commenced an action against the Taylors by filing a petition in district court as forecasted in the December 22 letter. *See* Iowa R. Civ. P. 1.301(1). Pursuant to court rules, she was obligated to serve the Taylors with notice of the lawsuit within ninety days. *See id.* r. 1.302(5). Rucker took no action to satisfy this requirement, also as forecasted in the letter.

Instead, on January 13, 2011, Field sent another letter to Kneip, enclosing some employment and medical records concerning Rucker. Kneip responded to this letter on January 31. He thanked Field for the January 13 letter and requested additional medical records. Nothing was said about the December 22 proposal.

Nevertheless, Field and Kneip continued to negotiate during February and March, periodically exchanging offers of settlement. Kneip sent a settlement offer to Field on March 4, and Field made a counteroffer in a letter dated March 16.

The next communication between the parties was a letter from Field to Kneip on April 19. It requested an update on his March 16 settlement offer.

On March 29, the ninety-day period for service elapsed. On April 4, a district court administrator notified Field that no proof of service had been filed. The notice scheduled a conference to determine the status of the action for April 26. Rucker then promptly served the Taylors with original notice and a copy of the petition on April 13 and April 15.

The Taylors subsequently filed a motion in district court to dismiss the petition for failure to accomplish timely service of process. Following a hearing on the motion, the district court denied the motion, stating:

> The court finds that good cause exists for Plaintiff's failure to serve Defendants with notice of the lawsuit. The court finds that good cause, in this case, as the claims representative took advantage of the Plaintiff's straight forward offer to hold off serving the notice of the lawsuit in return for the exchange of additional information and continued settlement negotiations. From the affidavits and the argument of counsel, it appears to the court Plaintiff's attorney clearly was operating under the assumption that by continuing to correspond, negotiate, and exchange documentation, Plaintiff's counsel believed the allied claims representative had accepted and/or acquiesced in Plaintiff's offer to hold off service pending negotiations.

The Taylors sought interlocutory review, and we transferred the case to the court of appeals. The court of appeals affirmed the decision of the district court. It rejected the Taylors' argument that good cause did not exist for failure to accomplish timely service of process because no express agreement existed between the parties to suspend service.

The Taylors sought and were granted further review. They argued that no agreement, either express or implied, was formed to justify the failure to accomplish timely service. They asserted Rucker made no offer that could create a contract to delay service of process because the December 22 letter from Field never explicitly mentioned the ninety-day service deadline, and Kneip was not a lawyer trained in the particulars of court rules to understand the legal requirements of service of process. Additionally, they argued Kneip never accepted any offer, and to hold otherwise would impose an unfair affirmative duty on claims representatives of insurance companies to respond to claimants' attorneys making proposals to delay timely service. They argued this

duty would bind insurance companies to agreements they did not want and did not expressly accept.

In response, Rucker asserted the parties formed an implied agreement by continuing to negotiate after the proposal was made. She also argued good cause existed to extend time for service because the conduct of the insurance claims representative in continuing to negotiate after the December 22 letter misled her attorney into believing the Taylors would not seek a dismissal for failing to accomplish timely service.

## II.  Scope of Review.

We review decisions by the district court to grant a motion to dismiss for correction of errors at law. *Crall v. Davis*, 714 N.W.2d 616, 619 (Iowa 2006); *see also* Iowa R. App. P. 6.907. Ordinarily, the pleadings in the case form the outer boundaries of the material subject to evaluation in a motion to dismiss. *Wilson v. Ribbens*, 678 N.W.2d 417, 418 (Iowa 2004). As a consequence, district courts generally do not consider facts outside the pleadings in evaluating a motion to dismiss. *Id.* An exception to this rule exists when the grounds for the motion are based on an alleged failure to provide timely service within the required time frame. *Carroll v. Martir*, 610 N.W.2d 850, 856 (Iowa 2000). In such a case, like this case, a court is permitted to consider facts outside the pleadings. *See id.*

When the district court makes findings of fact, those findings "are binding on appeal unless not supported by substantial evidence." *McCormick v. Meyer*, 582 N.W.2d 141, 144 (Iowa 1998). We are not bound, however, by either the legal conclusions or application of legal principles reached by the district court. *Dennis v. Christianson*, 482 N.W.2d 448, 450 (Iowa 1992).

### III. Discussion.

On many occasions in the past, we have interpreted the "good cause" standard for justifying the failure to timely serve the original notice and petition following the filing of a lawsuit. *See, e.g.*, *Crall*, 714 N.W.2d at 620–21; *Wilson*, 678 N.W.2d at 620–22; *Meier v. Senecaut*, 641 N.W.2d 532, 541–43 (Iowa 2002); *Henry v. Shober*, 566 N.W.2d 190, 192–93 (Iowa 1997); *Alvarez v. Meadow Lane Mall Ltd. P'ship*, 560 N.W.2d 588, 591 (Iowa 1997). Each occasion has given us the opportunity to add greater clarity and meaning to the operative phrase "good cause" found in our rule governing service. This case presents another opportunity to interpret the rule, which follows the nature of the larger process of judicial interpretation. No rule or statute can be written to clearly direct the outcome of all circumstances to come, and it is the task of courts to interpret enactments on a case-by-case basis. Thus, decisions of courts interpreting rules and statutes in the context of the facts of individual cases contribute to the growing understanding of the rule or statute.

We begin by putting our service rule in perspective. A civil action is commenced upon the filing of a petition in district court. Iowa R. Civ. P. 1.301(1). Our rules of procedure then require a plaintiff to serve the defendant with process within ninety days of filing the petition or risk dismissal either upon motion of the defendant or on the initiative of the court. *Id.* r. 1.302(5). The rule specifies in pertinent part:

> If service of the original notice is not made upon the defendant . . . within 90 days after filing the petition, the court, upon motion or its own initiative after notice to the party filing the petition, shall dismiss the action without prejudice as to that defendant . . . . If the party filing the papers shows good cause for the failure of service, the court shall extend the time for service for an appropriate period.

*Id.*

Although the wording of the rule does not expressly permit a defendant who was served beyond the ninety-day period to move for dismissal, we have held a defendant may move for dismissal. *See Meier*, 641 N.W.2d at 541–42. Our prior cases also suggest the rule impliedly enables a plaintiff to assert good cause for delay in service in a resistance to a motion to dismiss. *See id.* at 542–43 (examining plaintiff's assertion of good cause after court granted defendant's motion to dismiss); *Wilson*, 678 N.W.2d at 419–23 (same).

Regarding a showing of good cause, we have said:

"[T]he plaintiff must have taken some affirmative action to effectuate service of process upon the defendant or have been prohibited, through no fault of his [or her] own, from taking such an affirmative action. Inadvertence, neglect, misunderstanding, ignorance of the rule or its burden, or half-hearted attempts at service have generally been waived as insufficient to show good cause. Moreover, intentional nonservice in order to delay the development of a civil action or to allow time for additional information to be gathered prior to 'activating' the lawsuit has been held to fall short of [good cause]."

*Henry*, 566 N.W.2d at 192–93 (quoting *Vincent v. Reynolds Mem'l Hosp., Inc.*, 141 F.R.D. 436, 437–38 (N.D.W.Va. 1992)).

We elaborated on this definition in *Wilson*, stating:

"[G]ood cause is likely (but not always) to be found when the plaintiff's failure to complete service in timely fashion is a result of the conduct of a third person, typically the process server, the defendant has evaded service of the process or engaged in misleading conduct, the plaintiff has acted diligently in trying to effect service or there are understandable mitigating circumstances. . . ."

*Wilson*, 678 N.W.2d at 421 (quoting 4B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1137, at 342 (3d ed. 2002)).

This elaboration in *Wilson* illustrates the influence of the facts of each case in the interpretive process. In *Henry*, the plaintiffs' out-of-state attorney was engaged in settlement negotiations with the defendant's insurance claims representative over plaintiffs' claim for injuries. 566 N.W.2d at 191. Eventually, faced with the expiration of the statute of limitations, he contacted an Iowa attorney to file a lawsuit. *Henry*, 566 N.W.2d at 191. The lawsuit was filed, but no action was taken to pursue service of process. *Id.* Instead, the out-of-state attorney continued to negotiate with the claims representative. *See id.* After settlement negotiations broke down some time later and service was accomplished, the defendant moved for dismissal for the failure by plaintiffs to make timely service of process. *Id.*

We affirmed the decision of the district court to dismiss the case. *Id.* at 193. We held that the defendant's insurance representative's knowledge that the petition had been filed and continued settlement negotiations with plaintiff's counsel did not establish good cause. *Id.* at 192–93. We found good cause based on these circumstances would undermine the purpose of the rule to move cases along in the court system once they had been filed. *See id.* at 193.

On the other hand, in *Wilson*, the parties sought to form an agreement to delay service for the purpose of continuing their settlement negotiations, which they memorialized in a pair of letters exchanged shortly after the plaintiff filed a petition in district court. 678 N.W.2d at 418–19. After a long period of negotiations and an exchange of medical records, negotiations broke down and the defendant sought dismissal based on untimely service, which the district court granted. *Wilson*, 678 N.W.2d at 419.

Although the plaintiff in *Wilson*, as in *Henry*, purposely did not timely serve the defendant because of the ongoing, good-faith settlement negotiations between the parties, we found, unlike in *Henry*, good cause could exist. *Id.* at 422. We reached this conclusion, even though the conduct of the parties—the agreement to delay service—undermined the underlying purpose of the service rule to move cases along, as in *Henry*. *See id.* at 423 ("[T]he court system has a keen interest, notwithstanding the wishes of the parties, to keep the wheels of justice in motion."). We found the additional fact in *Wilson* of an agreement between the parties to delay service could support good cause. *Id.* at 422. Thus, we implicitly modified *Henry*'s conclusion, holding good-faith settlement negotiations *can* satisfy the good-cause standard when accompanied by an agreement between the parties to delay service. *See id.*

Yet, our holding in *Wilson* was not predicated on the enforceability of the agreement. *See id.* ("[W]e remain highly skeptical of the utility of agreements delaying service . . . ."). In fact, we referred to the agreement as an "alleged agreement." *Id.* Instead, *Wilson* expanded the scope of good cause in two ways. First, the case directed an inquiry into the role of the corresponding conduct of the parties in causing the plaintiff to fail to timely serve the defendant. *See id.* Second, the case injected consideration of the principles of estoppel that seek to prevent unjust results. *See id.* at 423.

For sure, courts can always enforce the service rule on their own initiative to achieve its purposes, independent of the course of conduct of the parties. *See* Iowa R. Civ. P. 1.302(5). Additionally, a defendant may also uphold the purpose of the service rule by moving to dismiss for untimely service. *See Meier*, 641 N.W.2d at 541–42. But, in both instances, good cause must be considered in deciding to dismiss a

petition for untimely service, and *Wilson* informs us that this standard considers all the surrounding circumstances, including circumstances that would make it inequitable for a defendant to successfully move to dismiss. *See* 678 N.W.2d at 422–23. In *Henry*, it was not inequitable for the defendant to move to dismiss when his insurance representative only continued to negotiate a settlement and did nothing to make the plaintiff think service was unnecessary. *See* 566 N.W.2d at 191, 192–93. In *Wilson*, it was inequitable for the defendant to move to dismiss after allegedly agreeing to delay service. *See* 678 N.W.2d at 422. In the end, the results of both cases are consistent with our long-standing approach that dismissal for failing to timely accomplish service of process is appropriate when the failure results from " '[i]nadvertence, neglect, misunderstanding, ignorance of the rule or its burden, or half-baked attempts at service.' " *See id.* at 421 (quoting *Henry*, 566 N.W.2d at 192–93).

Of course, this case would be quickly resolved on the basis of stare decisis if Rucker's attorney and the Taylors' insurance claims representative had entered into an express agreement, as was done in *Wilson*. Rucker, nevertheless, argues the same result is achieved with an implied agreement. We agree with Rucker that the holding in *Wilson* applies equally to implied agreements.

We have said of implied contracts:

A contract may be express or implied. When the parties manifest their agreement by words the contract is said to be express. When it is manifested by conduct it is said to be implied in fact. Both are true contracts formed by a mutual manifestation of assent by the parties to the same terms of the contract. The differentiation arises from the method of proving the existence thereof.

*Ringland-Johnson-Crowley Co. v. First Cent. Serv. Corp.*, 255 N.W.2d 149, 152 (Iowa 1977); *accord Cassaday v. De Jarnette*, 251 Iowa 391, 397, 101 N.W.2d 21, 25 (1960); *see also Newman v. City of Indianola*, 232 N.W.2d 568, 574 (Iowa 1975) (holding that a request to the city that it service 500 feet of land manifested assent to pay reasonable costs for service); Restatement (Second) of Contracts § 4 (1981) ("A promise may be stated in words either oral or written, or may be inferred wholly or partly from conduct.").

Or, as the Restatement (Second) of Contracts states:

> Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance.

Restatement (Second) of Contracts § 4 cmt. *a* at 14; *see also* 1 Joseph M. Perillo, *Corbin on Contracts* § 1.19, at 55, 57–58 (rev. ed. 1993).

Yet, "[a]n implied-in-fact contract requires mutual manifestation of assent." *Nichols v. City of Evansdale*, 687 N.W.2d 562, 574 (Iowa 2004). Mutual assent is ordinarily manifested through offer and acceptance, within our contract principles. *See Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285 (Iowa 1995); *see also* Restatement (Second) of Contracts § 22(1) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties.").

We objectively analyze whether a contract has been formed. *Anderson*, 540 N.W.2d at 285. " 'The standard is what a normally constituted person would have understood [the words] to mean, when used in their actual setting.' " *Id.* at 286 (quoting *N.Y. Trust Co. v. Island*

*Oil & Transp. Corp.*, 34 F.2d 655, 656 (2d Cir. 1929)) (alteration in original). In other words, "[t]he test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender.'" *Id.* (quoting *Architectural Metal Sys., Inc. v. Consol. Sys., Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995)).

Additionally, it is important to recognize for the purposes of this case that "[e]ven though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." Restatement (Second) of Contracts § 33(1) at 92. "The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance." *Id.* § 33(3) at 92; *see also Anderson,* 540 N.W.2d at 286; *Architectural Metal Sys.,* 58 F.3d at 1229 ("A lack of essential detail would negate . . . a belief [that an acceptance could bind the offeror], since the sender could not reasonably be expected to empower the recipient to bind him to a contract of unknown terms.").

Applying these principles, we conclude there was no implied contract in this case to apply the *Wilson* holding. The December 22 letter fell short of an offer to modify the ninety-day service requirement. The letter contained only a vague allusion suggesting that service would occur at some point in the future once negotiations fail. But, it was too vague to constitute an offer to alter the rule by delaying service in exchange for a promise not to seek a dismissal.

Furthermore, we recognize that silence does not normally constitute an acceptance of an offer. *See Prestype Inc. v. Carr*, 248 N.W.2d 111, 120 (Iowa 1976). Here, the insurance claims representative took no action to accept any offer. We recognize that exceptions to the

general rule exist, but none are applicable to this case. *See* Restatement (Second) of Contracts § 69 at 164.

With no express or implied contract to serve as the basis for good cause, we return to consider whether the circumstances of this case can nevertheless satisfy the good-cause standard of rule 1.302(5). We begin by reiterating that *Wilson* does not require proof of an enforceable contract before good-faith settlement negotiations can support a finding of good cause. *See* 678 N.W.2d at 422. Instead, good cause requires an examination of all of the surrounding facts to determine if they reveal "understandable mitigating circumstances." *See id.* at 421, 422 (citation and internal quotation marks omitted).

With respect to the conduct of Rucker in this case, we observe that her attorney, Field, communicated his plan to purposely delay service of process to the Taylors' insurance representative, unlike the plaintiff in *Henry*, but like the plaintiff in *Wilson*. *Compare Henry*, 566 N.W.2d at 191, *with Wilson*, 678 N.W.2d at 419. With respect to the conduct of the Taylors in this case, their insurance representative had actual knowledge that Rucker's attorney did not intend to timely serve process, unlike the defendant in *Henry*, but like the defendant in *Wilson*. *Compare Henry*, 566 N.W.2d at 191, *with Wilson*, 678 N.W.2d at 419. In *Henry*, the defendant was only aware that the petition had been filed, not that the plaintiff would not be pursuing timely service of process. 566 N.W.2d at 192. Thus, this case is much closer to *Wilson* than *Henry*, both on the facts and the underlying critical rationale to avoid an unjust result.

Importantly, the action by the insurance representative in this case in continuing to negotiate with Rucker's attorney with knowledge that Rucker did not plan to timely serve the petition made it inequitable for the Taylors to subsequently seek dismissal of the case after an inquiry by

the court administrator into the absence of service prompted Rucker to serve the Taylors. While mere knowledge by the insurance representative of the existence of a lawsuit is not relevant to the good-cause determination, *see Henry*, 566 N.W.2d at 192, knowledge by the insurance representative in this case that Rucker's attorney did not plan to pursue timely service is relevant under the circumstances. This knowledge would have informed the insurance representative that his continued negotiations would help to reinforce expectations by Rucker's attorney that he did not need to take action to comply with the service rule.

The Taylors were not obligated to respond to the plan by Rucker to delay service. Yet, their actions in not responding to his plan and continuing to negotiate with knowledge that Rucker was going to delay service made it "understandable" for Rucker not to timely serve, and these actions brought the doctrine of estoppel into play to make it inequitable for the Taylors to seek a dismissal under the circumstances. By engaging in the precise conduct attorney Field requested under his plan, the Taylors insurance representative gave Field an impression the plan was acceptable.

Because the substantive rights of a plaintiff can be at stake through the application of a statute of limitations, it is important that the good-cause standard under rule 1.302(5) not be applied too narrowly. As observed under the analogous federal rule,

> [a] dismissal without prejudice under Rule 4(m) for failure to serve process is intended to leave the plaintiff in the same position as if the action never had been filed. This raises a difficult question when the statute of limitations has expired between the filing of the complaint and the dismissal of the action for noncompliance with Rule 4(m). Although technically the dismissal is without prejudice, realistically if the plaintiff's action is now barred by the running of the

limitations period his or her rights have effectively been terminated.

4B Wright & Miller § 1137, at 399. Indeed, the 1993 advisory committee's note to Federal Rule 4(m) states that "[r]elief may be justified . . . if the applicable statute of limitations would bar the refiled action." Fed. R. Civ. P. 4(m) advisory committee's note. Federal courts thus consider as a factor in their determination whether a dismissal would ultimately be prejudicial to the plaintiff, particularly when the delay in service is a result of misleading conduct by the defendant. *See Ditkof v. Owens-Illinois, Inc.*, 114 F.R.D. 104, 105 (E.D. Mich. 1987). Because our rule is exceedingly similar to Rule 4(m), we find federal court interpretations persuasive. *Wilson*, 678 N.W.2d at 420–21.

Moreover, one federal court has noted that the time limit for service was not meant to be "enforced harshly and inflexibly." *See United States v. Ayer*, 857 F.2d 881, 885–86 (1st Cir. 1988). Indeed, it was intended "to be a useful tool for docket management, not an instrument of oppression." *Id.*; *accord Floyd v. United States*, 900 F.2d 1045, 1049 (7th Cir. 1990). Therefore, federal courts limit the "harsh sanction" of dismissal (even a nonprejudicial one) to cases "in which non-service was the result of mere inadvertence." *D'Amario v. Russo*, 750 F. Supp. 560, 563 (D.R.I. 1990) (citation and internal quotation marks omitted).

### IV. Conclusion.

We conclude the district court did not commit legal error by concluding good cause existed for the failure to accomplish timely service of process. We affirm the decision of the court of appeals and the judgment of the district court.

**DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED; CASE REMANDED.**

All justices concur except Waterman and Mansfield, JJ., who dissent.

**WATERMAN, Justice. (dissenting).**

I respectfully dissent. Today's majority effectively overrules our precedent requiring the defendant's agreement or misleading conduct amounting to an estoppel to extend Iowa Rule of Civil Procedure 1.302(5)'s ninety-day deadline to serve suit papers and replaces that clear, bright-line rule with an amorphous standard. A party may now evade the ninety-day service requirement without an agreed extension simply by negotiating and sending a letter the majority acknowledges

> contained only a vague allusion suggesting that service would occur at some point in the future once negotiations fail. But, it was too vague to constitute an offer to alter the rule by delaying service in exchange for a promise not to seek a dismissal.

Under our existing precedent, exceeding the ninety-day deadline was deemed to be presumptively abusive and shifted the burden to the plaintiff to show justification. *See Meier v. Senecaut*, 641 N.W.2d 532, 542 (Iowa 2002). We had also made it clear that settlement negotiations—even if done in good faith—were not an adequate justification. *See Henry v. Shober*, 566 N.W.2d 190, 193 (Iowa 1997). However, an agreement to extend service could be an adequate justification. *See Wilson v. Ribbens*, 678 N.W.2d 417, 422–23 (Iowa 2004). We have also indicated that conduct by the defendant amounting to a waiver or estoppel could be an adequate justification. *See id.* at 423.

This framework, I believe, provided clear guidance to the bar and to district courts. The majority now casts aside that framework and substitutes a new, circular approach under which "good cause" can be shown by "an examination of all of the surrounding facts to determine if they reveal 'understandable mitigating circumstances,' " quoting *Wilson*

without acknowledging the court was referring to an *agreement* to delay service. *See id.* at 421. With respect, it is not a workable standard to allow unspecified "understandable mitigating circumstances" to excuse untimely service in the absence of an agreed extension.

We squarely held in *Henry* that "settlement negotiations, even if done in good faith, do not constitute adequate justification or good cause for delaying service." 566 N.W.2d at 193. We aptly observed:

> If we were to allow delays in service for ongoing settlement negotiations, plaintiffs would have no incentive to serve the defendant within a reasonable time. Further, we do not see how service of the original notice and petition is a hindrance to the settlement process. Prompt service allows a defendant to investigate the claims and prepare its defense, thus contributing to its evaluation of a case. If the parties wish to continue settlement discussions beyond the limitations period, the plaintiff should secure a statute of limitations extension, in writing, from the defendant and the defendant's insurer.

*Henry*, 566 N.W.2d at 193. What has changed?

In *Wilson*, we reiterated that "good-faith settlement negotiations standing alone do not constitute good cause for delays in service beyond the ninety-day limit." 678 N.W.2d at 422. We noted the *Henry* rule "is consistent with the decisions of a number of other courts, federal and state, applying Federal Rule of Civil Procedure 4(m) or similar state rules." *Wilson*, 678 N.W.2d at 422 (surveying authorities). Indeed, a federal district court recently echoed our observations in *Henry*:

> Moreover, this Court rejects the basic premise that negotiations to resolve an action can constitute good cause for failing to serve. The Federal Rules of Civil Procedure provide clear, fixed dates by which action must be taken for many salutary purposes. Opposing parties have the benefit of being able to know (or at least predict) when action will be taken against them; clients have the assurance that their counsel will be required to afford timely attention to their case; and the court system is assured that parties will not "reserve a table" by filing a complaint, and then negotiate

endlessly at their leisure while the court's docket becomes crowded with aging, dormant cases.

*Rees v. Bd. of Cnty. Comm'rs*, Civ. Action No. 07-CV-00230-MSK-KLM, 2008 WL 3285256, at \*2 (D. Colo. Aug. 7, 2008).

In *Wilson*, we held that an *agreement* to delay service may constitute "good cause" under rule 1.302. 678 N.W.2d at 422. That unanimous opinion began by acknowledging "[t]he judicial system has a keen interest in the prompt and effective administration of justice." *Wilson*, 678 N.W.2d at 418. We expressed skepticism "of the utility of agreements delaying service or extending the statute of limitations in pending litigation in the hope of settlement." *Id.* at 422. But, we acknowledged that some federal courts found good cause for delay "*if* the parties had entered into an *agreement* to extend the service period." *Id.* We noted it would be "highly misleading" for an insurer to *agree* to an extension and then file a motion to dismiss for untimely service. *Id.* That is not what happened with Rucker. Our decision in *Wilson* made clear that settlement negotiations alone, in the absence of defendant's agreement to extend the deadline, fell short of establishing good cause for delayed service. *Id.*

The majority cites no intervening change in the law or trend in the decisions of federal courts or other states applying equivalent rules. Nor does the majority contend that requiring an agreed extension in lieu of timely service has proven with experience to be unfair or impractical. To the contrary, I believe the common practice is to either accomplish service within ninety days or secure an agreed extension. Indeed, Rucker's counsel candidly stated he expected to be "chewed out" at oral argument before our court for his failure to get an "explicit" agreement to

delay service. There is no good reason to undermine the clarity of rule 1.302(5) or abandon our precedent here.

> It nearly goes without saying that the doctrine of stare decisis is one of the bedrock principles on which this court is built. It is an important restraint on judicial authority and provides needed stability in and respect for the law.

*Kiesau v. Bantz,* 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting).

Stare decisis should carry special weight, I believe, when we are interpreting our own *rule.* "If that rule is now found to be too harsh and inelastic, we have reserved the power to ourselves . . . to amend it." *Stolar v. Turner,* 236 Iowa 628, 651, 19 N.W.2d 585, 595 (1945) (Smith, J., dissenting). I recognize there is a tension between expediting litigation and accommodating the desire of parties to engage in continued settlement negotiations. However, if we are going to shift the balance in this area, it makes far more sense to do so by promulgating a proposed rule change and inviting public comment.[1]

The majority acknowledges there was no agreement, either expressed or implied, to extend the time for service. Rucker never contended that the defendant engaged in conduct that would amount to an estoppel to excuse the untimely service. Nevertheless, the majority says that dismissal is inequitable because of "the action by the insurance representative in this case in continuing to negotiate with Rucker's attorney with knowledge that Rucker did not plan to timely serve the petition"—essentially the argument we rejected in *Henry.* The majority tries to distinguish *Henry* on grounds that the adjuster in that case was unaware plaintiff's counsel planned to delay service. Nothing in *Henry*

---

[1]Until now, we seemingly had landed in favor of moving cases along. "To do otherwise permits cases to sit in the system growing whiskers, an unnecessary and most undesirable result." *Wilson,* 678 N.W.2d at 424.

indicates that distinction made a difference. To the contrary, the *Henry* court stated, "It is irrelevant whether or not State Farm knew the Henrys intended to file a lawsuit." 566 N.W.2d at 192. So, why would knowledge regarding a plan to delay service of process matter? In any event, we reiterated in *Wilson*—a case in which the insurer knew plaintiff planned to delay service—that good-faith negotiations were insufficient to excuse untimely service. *Wilson,* 678 N.W.2d at 422.

The majority also states, "The Taylors were not obligated to respond to the plan by Rucker to delay service. Yet, their actions in not responding to his plan and continuing to negotiate" make dismissal "inequitable." This strikes me as doubly incorrect. In the first place, we are holding in this case that the insurer *did* have a duty to respond if it wanted to be able to assert the ninety-day deadline for service. Second, we are, in effect, shifting the burden that was previously on the plaintiff to show "justification." *Meier,* 641 N.W.2d at 542.

I prefer to see cases resolved on their merits, and I think there is something to be said for amending our rule to conform to Federal Rule of Civil Procedure 4(m). Under that rule, even if the plaintiff fails to show "good cause" for not serving the defendant by the deadline, the district court has discretion to extend the time for service. *See* Fed. R. Civ. P. 4(m) (providing that, if a defendant is not timely served, the court "must dismiss the action without prejudice against that defendant *or order that service be made within a specified time*" (emphasis added)). This would have given the district court the flexibility to do what it did in this case.

A significant advantage of this approach is that it allows for some play in the joints. District courts would have the ability either to afford or to deny relief to the plaintiff in a case like this without being subject to an appellate reversal. Unfortunately, under the majority's approach, the

legal rule is ill-defined and the district court has no discretion in applying it. This seems to me likely to lead to increased appellate litigation in this area.

For the foregoing reasons, I respectfully dissent.

Mansfield, J., joins this dissent.