# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1137

_____

Stine Seed Company

*Plaintiff - Appellant*

v.

A & W Agribusiness, LLC; James R. Williams; C. Daniel Alexander

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: February 9, 2017
Filed: July 13, 2017

_____

Before LOKEN, COLLOTON, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Stine Seed Company (Stine Seed), an Iowa corporation, sued A&W Agribusiness (A&W), an Illinois limited liability corporation, and its principals, James R. Williams and C. Daniel Alexander, both Illinois residents, for breach of contract, breach of implied-in-fact contract, and unjust enrichment. Stine Seed alleged that it delivered corn and soybean seed worth $279,000 to A&W, and that,

although the defendants planted the seed and sold the resulting crop, they never paid Stine Seed. Alexander filed no answer or responsive pleading, and default judgment was entered against him. The case against Williams and A&W proceeded to a bench trial. The court found in favor of Stine Seed on its implied-in-fact contract claim against Williams in the amount of $28,160, and found in favor of Williams and A&W on the remaining claims. Stine Seed appeals. We affirm in part and reverse in part.

## I. Background

Williams testified at trial that in February 2010, he and Alexander joined J&A Farms (J&A), an existing partnership between Don Wheatley and Eric Funk. J&A owned thousands of acres of farmland, but was having trouble obtaining financing to buy seed. Williams met with J&A's bank, the Bank of Rantoul, which agreed to extend a line of credit to J&A if Williams personally guaranteed it. That fall, J&A lost about $220,000 on its harvest. The Bank of Rantoul limited J&A's line of credit, requiring J&A to seek financing for its operations from other sources.

In the fall of 2010, Williams and Alexander decided to form A&W. A&W's operating agreement identified Alexander as a "manager" and Williams as a "member" of the company. It provided that managers would have no authority to acquire or sell property, borrow or lend money, or execute any security documents on behalf of the company "without the express approval of members holding at least a majority of all Member Interests." Williams was the only member, and therefore was the only person who held a majority of member interests.

The parties offer differing accounts of J&A's plans to purchase seed for the 2011 planting season, and of A&W's role in those plans. Williams testified that J&A planned to purchase its seed through another farm he operated—RJW Williams Farms (RJW). He explained that he planned to use RJW's John Deere credit account to finance the purchases, which would allow J&A to take advantage of a low interest

rate and a bulk discount. Williams testified that he intended to purchase 500 units of corn for J&A from Channel Seed through RJW. Additionally, in his understanding, Alexander would purchase another 380 units of corn from LG Seeds for J&A, also using the John Deere credit account. Finally, J&A would purchase about 100 units of corn, as well as some soybeans, from Stine Seed. As Williams understood it, Wheatley and Funk would purchase the soybeans through Brad Ramp, who was a J&A employee, as well as a dealer for both Stine Seed and Channel Seed. Williams testified that there were no plans to use A&W to purchase seed for J&A, and that the sole purpose of A&W was to limit his and Alexander's liability for J&A's losses.

Alexander, on the other hand, testified via deposition that J&A planned to purchase all of its seed from Stine Seed through Ramp. However, Stine Seed rejected J&A's application for credit. As a result, Alexander testified, he and Williams decided to use A&W to buy seed on behalf of both J&A and RJW. This arrangement, according to Alexander, would allow A&W to obtain a bulk discount on seed and pass the savings along to J&A and RJW. Wheatley and Funk also testified via deposition that this was J&A's plan to purchase seed.

Brad Hubble, a regional sales manager for Channel Seed, testified via deposition that in the fall of 2010, he and Williams discussed J&A's plan to purchase seed from Channel Seed. Eric Curry, a district sales manager for Channel Seed, testified via deposition that he met with Williams, Wheatley, and Funk about the prospective purchase. On October 29, 2010, RJW placed an order for 600 units of corn from Channel Seed, financed through RJW's John Deere credit account. Williams testified that 500 of the units were intended to be planted by J&A, and the other 100 units were intended to be planted by RJW, though the order form does not specify that part of the seed was to go to J&A. According to Williams, J&A's other partners were aware of these arrangements.

In contrast, Ramp testified via deposition that in the fall of 2010, Williams and Alexander informed him that they had formed a limited liability corporation to pool seed purchases. Ramp provided them with a credit application for purchasing seed from Stine Seed. Later that fall, Ramp became a district sales manager for Stine Seed, and as a result, was no longer permitted to sell seed on behalf of other companies. Alexander filled out the credit application and sent it to Stine Seed. The application, dated December 20, 2010, listed Alexander, Williams, and A&W as the applicants, and sought $250,000 of credit to purchase 3,000 units of soybeans and 550 units of corn. The application appears to bear the signatures of Williams and Alexander. However, Williams testified that, although the signature on the application looks like his, it must be a forgery because he never signed the application and did not apply for credit from Stine Seed in December 2010. Alexander submitted another credit application to Stine Seed on January 25, 2011, for $250,000 to purchase 2,460 units of soybeans and 700 units of corn. Again, the application lists Alexander, Williams, and A&W as applicants and appears to bear the signatures of Williams and Alexander, but Williams denies that he signed it. Alexander testified that he did not remember seeing Williams sign the applications, but Ramp testified that he saw Williams sign either the December or January application.

Ramp testified that in March 2011, he provided Alexander and Williams with a document adjusting A&W's credit amount from $250,000 to $300,000. The document appears to have been signed by Alexander and Williams on March 20, 2011. Williams denies signing the document, but Ramp testified that he witnessed Williams sign it. On April 15, 2011, Alexander signed a promissory note (the Note) committing A&W to borrow $300,000 from Stine Seed. The Note appears to bear the signatures of Williams and Alexander, but again, Williams denies the signature is his. In his deposition, Alexander testified that he did not know whether the signature on the Note was Williams'. He testified that he might have signed Williams' name, but that he could not recall. He further testified that Williams had expressly authorized

-4-

him to sign documents on his behalf. Williams testified that he had not given Alexander, or anyone else except his wife, permission to sign his name.

In the spring of 2011, Ramp planted corn on J&A's land. The majority of the corn he used was from Stine Seed. Funk planted the soybean seed on J&A's land, which all came from Stine Seed. Williams was not involved in the planting, because he had two hip surgeries between December 2010 and June 2011, and could not drive a tractor or plant more than a small amount of seed. At the end of May, Wheatley and Ramp returned 400 units of unplanted corn from Channel Seed to RJW. Williams testified that he was shocked that corn from Stine Seed had been planted on J&A's land instead of all 500 units of corn purchased from Channel Seed for J&A. Williams testified that he confronted Ramp about why he had planted corn from Stine Seed instead of Channel Seed. According to Williams, Ramp said that he did it for the "commission," but Ramp denies that this conversation occurred. Williams was able to return the unplanted seed to Channel Seed and receive credit.

Although Williams disputes the validity of A&W's purchase of seed from Stine Seed on behalf of J&A, he concedes that he purchased approximately 100 units of corn and 400 units of soybeans from Stine Seed for RJW to plant in the spring of 2011. He testified he has never received an invoice for the seed, but offered to pay what he believes the seed was worth—about $25,000 to $27,000.

In July 2011, Williams met with Ramp and Myron Stine—the vice president of sales and marketing for Stine Seed. Ramp testified that at this meeting, Williams signed a document (the July Adjustment) altering the sum A&W owed to Stine Seed from $300,000 to $279,206, to reflect the actual price of the seed. The document appears to bear both Williams' and Alexander's signatures, but Williams denies signing it. Williams testified that he signed a different document at the meeting, one relating to his purchase of seed for RJW. Myron Stine testified that he did not remember Williams signing any documents at the meeting.

Ramp harvested J&A's crops in the fall of 2011. The proceeds were insufficient to cover A&W's debt to Stine Seed. Instead of paying Stine Seed, J&A used the money to pay down the line of credit at the Bank of Rantoul. However, J&A was not able to pay its entire debt to Bank of Rantoul, which declined to offer J&A a new line of credit after the harvest.

The district court acknowledged that there was conflicting evidence and irreconcilable testimony in the case. Ultimately, it found Williams' testimony to be more credible than Alexander's or Ramp's. Thus, it found that Williams did not sign, or authorize anyone else to sign, the Note or the other documents relating to A&W's purchase of seed from Stine Seed. The court also found that Williams did not authorize Alexander to apply for or accept credit from Stine Seed on behalf of A&W. The court issued a verdict in favor of A&W on all claims, and in favor of Williams on the breach of contract and unjust enrichment claims. The court issued a verdict against Williams in the amount of $28,160 on the implied-in-fact contract claim against him, to compensate Stine Seed for the seed Williams conceded he purchased for RJW. Stine Seed filed a motion to amend or alter the judgment under Federal Rule of Civil Procedure 59(e), but the motion was denied. This appeal followed.

## II. Discussion

Stine Seed appeals the verdict on the grounds that the district court erred when it (1) found that Williams did not ratify the Note; (2) concluded that Williams is not liable to Stine Seed under an implied-in-fact contract or unjust enrichment theory for the seed planted by J&A; and (3) found that Alexander lacked the authority to bind A&W to the Note. The parties agree that we should apply the federal standard of review in this appeal from a bench trial in a diversity action. See Meecorp Capital Mkts., LLC v. PSC of Two Harbors, LLC, 776 F.3d 557, 562 n.5 (8th Cir. 2015) (applying the federal standard of review to an appeal from a bench trial in a diversity action "because both parties agree it governs"). "In an 'appeal from a civil bench

trial, we review the trial court's findings of fact for clear error. Its conclusions of law are subject to de novo review. Mixed questions of law and fact that require the consideration of legal concepts . . . are also reviewed de novo." Id. at 562–63 (alteration in original) (quoting Darst–Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth., 339 F.3d 702, 710–11 (8th Cir. 2003)). The parties do not dispute that Iowa law applies to the claims at issue.

## A.      Williams' ratification of the Note

Stine Seed contends that—even accepting *arguendo* the district court's finding that Williams did not sign or authorize Alexander to sign the Note—the court clearly erred in finding that Williams did not later ratify the Note. Under Iowa law, a party can ratify his unauthorized signature on a contract either expressly or by his conduct, binding him to the contract as if his signature had been authorized. See Iowa Code § 554.3403 & cmt. 3. According to Stine Seed, Williams ratified the Note in two ways: expressly, by signing the July Adjustment, and by "his words and deeds after the Note was delivered to Stine."

First, Stine Seed argues that the district court clearly erred when it found that Williams did not sign the July Adjustment,[1] thereby expressly ratifying the Note, because the signature on the July Adjustment plainly matches authenticated samples

---

[1]Stine Seed also contends that the signatures on the December 2010 credit application and March 2011 adjustment plainly match Williams' authenticated signature samples. It argues that this contention is relevant "because it is completely irreconcilable with his claim that he didn't sign *any* documents related to A&W financing seed with Stine Seed for the 2011 crop year." As we understand the argument, it relates not to Williams' purported ratification of the Note, but to the overall credibility of his testimony. Regardless, for the reasons explained above with respect to the July Adjustment, we conclude that the court did not clearly err in finding that Williams did not sign any of the documents relating to A&W's purchase of seed from Stine Seed.

of Williams' signature.  See Greater Kan. City Laborers Pension Fund v. Thummel, 738 F.2d 926, 928 (8th Cir. 1984) ("[G]enerally the trier of fact may compare a contested sample of handwriting with an authenticated sample and decide that the contested sample is authentic even in the absence of expert testimony.").  Stine Seed notes that Williams himself conceded that the signature on the July Adjustment looks like his, although he denies he signed the document.  Stine Seed also argues that Williams' assertion that his signature was forged is not credible because it is inconsistent with the testimony of Wheatley and Funk—whom Stine Seed describes as "disinterested witnesses"—that Williams spoke with them about obtaining seed for J&A from Stine Seed through A&W, and because Williams has made accusations of forgery in a separate contract dispute involving different parties.

In comparing the signatures on the documents relating to A&W's purchase of seed from Stine Seed with authenticated samples of Williams' signature, the district court noted that "[a]ll the signatures appear to be similar in some aspects yet clearly contain some differences."  Thus, the court declined to find the signatures were authentic based on a visual comparison.  Instead, "[b]ased on all evidence," the court found Williams did not sign the disputed documents.

We cannot say this finding was clearly erroneous.  First, we agree with the court that although the disputed signatures, including the one on the July Adjustment, are similar to the authenticated signatures, they are not identical.  And under the circumstances of this case, the existence of some similarities between the disputed and authenticated signatures is not inconsistent with a finding that the disputed signatures were forged; Alexander and Ramp both worked with Williams, and would have had the opportunity to observe his signature on other documents.

Further, although conflicting testimony was presented at trial, it was not clear error for the district court to credit Williams' testimony over the testimony of other witnesses, including Wheatley and Funk.  "[W]hen a trial judge's finding is based on

-8-

his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). Here, because Williams' story was facially plausible and not contradicted by external evidence, and the court's findings were not internally inconsistent, the court did not err in finding him credible. Thus, we see no clear error in the district court's finding that Williams did not sign the July Adjustment.

Second, Stine Seed argues that the district court clearly erred in finding that Williams did not ratify the Note by his words or actions after the Note was delivered to Stine Seed. Stine Seed contends that this finding was clearly erroneous because the evidence adduced at trial shows Williams "had multiple discussions with Alexander, Wheatley, and Funk concerning the Note and/or A&W's purchase of seed from Stine generally, and he accepted and planted the seed from Stine personally and for use by J&A."

In finding that Williams did not ratify the Note by his later actions, the district court credited Williams' testimony that he did not know that units of corn from Stine Seed had been planted on J&A's land instead of the 500 units of corn he had ordered from Channel Seed. The court also observed that there was no evidence that Williams personally received or planted the seed from Stine Seed. Although, again, there was conflicting testimony on the question, it was not clear error for the court to find Williams' version of events credible. See id.

**B.     Implied-in-fact contract and unjust enrichment claims against Williams**

Stine Seed next argues that the district court committed legal error when it concluded that Williams was not liable to Stine Seed under either an implied-in-fact

contract theory or an unjust enrichment theory for the seed Stine Seed delivered to J&A.[2]

Initially, Stine Seed contends Williams is liable for the seed purchased through A&W for J&A under an implied-in-fact contract theory of liability.[3] Under Iowa law, parties form an implied-in-fact contract when their agreement is "manifested by conduct"—in contrast to an express contract, which parties form when they "manifest their agreement by words." McKee v. Isle of Capri Casinos, Inc., 864 N.W.2d 518, 526 (Iowa 2015) (quoting Rucker v. Taylor, 828 N.W.2d 595, 601 (Iowa 2013)). "Both are true contracts formed by a mutual manifestation of assent by the parties to the same terms of the contract." Id. (quoting Rucker, 828 N.W.2d at 601). The district court concluded that Williams did not breach an implied contract with Stine Seed because there was "insufficient evidence showing Stine Seed provided . . . services or materials to Williams . . . or that such services and materials were beneficial to Williams." Stine Seed contends that this conclusion was erroneous because Williams did benefit from the seed Stine Seed delivered to J&A: The proceeds of J&A's harvest were used to pay down J&A's line of credit with the Bank of Rantoul, which Williams personally guaranteed, thereby reducing his liability on the debt.

---

[2]No party challenges the court's conclusion that Williams is liable to Stine Seed under an implied-in-fact contract theory for the $28,160 worth of seed Williams admitted he purchased for RJW.

[3]Stine Seed refers to its claim interchangeably as one for "quantum meruit" and as one for "implied contract." Iowa courts generally use the term "implied contract" or "implied-in-fact contract" to refer to this type of claim. See Iowa Waste Sys., Inc. v. Buchanan Cty., 617 N.W.2d 23, 29 n.4 (Iowa Ct. App. 2000). They generally use the term "quantum meruit" to refer to the type of damages available for an implied-in-fact contract claim. See Scott v. Grinnell Mut. Reins. Co., 653 N.W.2d 556, 562 (Iowa 2002). For clarity, we mirror the terminology of the Iowa courts.

Even if Stine Seed did confer a benefit on Williams, the district court did not err in determining that it failed to establish an implied-in-fact contract claim against Williams for the seed purchased for J&A. The court found that Williams was unaware Alexander purchased seed through A&W from Stine Seed until after it was planted on J&A's land. Williams could not have manifested assent to the terms of an agreement of which he was unaware. Accordingly, under the facts as found by the district court, no implied-in-fact contract existed between Williams and Stine Seed with respect to the seed planted by J&A.

Next, Stine Seed argues that Williams is liable for unjust enrichment for the seed it provided to J&A. To establish a claim for unjust enrichment, Stine Seed was required to show "(1) it conferred a benefit upon [Williams] to its own detriment, (2) [Williams] had an appreciation of receiving the benefit, (3) [Williams] accepted and retained the benefit under circumstances making it inequitable for there to be no return payment for its value, and (4) there is no at-law remedy that can appropriately address the claim." Buchanan Cty., 617 N.W.2d at 30.

The district court concluded Williams was not liable for unjust enrichment because "[a]lthough there is some evidence Williams may have received a benefit at the expense of Stine Seed . . . there is a lack of sufficient evidence showing the retention of any benefit by Williams was unjust under the circumstances." Stine Seed points again to the fact that the proceeds from J&A's harvest reduced Williams' personal liability to the Bank of Rantoul. But we agree with the district court that, even assuming Williams received a benefit from J&A, it was not unjust for him to retain it. Under the facts as found by the district court, Williams was unaware of the agreement with Stine Seed, and was a victim of a forgery scheme in which Ramp, an agent of Stine Seed, may have been complicit. Because this "situation does not

-11-

conjure notions of justice," the court did not err in finding Williams not liable for unjust enrichment. Id. at 31.

## C.    Alexander's authority to bind A&W

Finally, Stine Seed argues that the district court clearly erred in finding Alexander had no authority to bind A&W to the Note. In Stine Seed's view, the district court should have found that Alexander had both actual and apparent authority to bind A&W; thus, the court should have entered judgment against A&W for breach of contract. We agree with Stine Seed that the district court clearly erred in finding Alexander had no authority to bind A&W, because it should have found Alexander had apparent authority to do so. As such, we need not reach the question of whether the court should have found Alexander had actual authority to bind A&W.

In his response to Stine Seed's request for admissions pursuant to Federal Rule of Civil Procedure 36, Williams—on behalf of himself and A&W—admitted: "C. Daniel Alexander has apparent authority to sign the Financial Credit Promissory Note on behalf of A&W Agribusiness LLC." Williams and A&W do not dispute that they never moved to withdraw or amend that admission. The parties also stipulated to those facts in the final pretrial order. Thus, Stine Seed argues, A&W is bound by its admission.

Federal Rule of Civil Procedure 36(b) provides: "A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." We construe the phrase "on motion" generously, "to encompass court filings that [are] not formal motions." Quasius v. Schwan Food Co., 596 F.3d 947, 951 (8th Cir. 2010). However, several circuits have held that when a party has made no filing that could be construed as a motion to withdraw or amend an admission, the court is required to give the admission conclusive effect. See Am.

-12-

Auto. Ass'n v. AAA Legal Clinic of Jefferson Crooke, P.C., 930 F.2d 1117, 1120 (5th Cir. 1991); Airco Indus. Gases, Inc. v. Teamsters Health & Welfare Pension Fund, 850 F.2d 1028, 1036–37 (3d Cir. 1988); Williams v. City of Dothan, 818 F.2d 755, 762 (11th Cir. 1987).  We agree with the reasoning of our sister circuits.  Williams and A&W do not dispute that they made no filing that could be construed as a motion to withdraw or amend their admission that Alexander had apparent authority to bind A&W.  Accordingly, the district court should have given the admission conclusive effect, and its finding that Alexander lacked authority to bind A&W to the Note was clear error.

Williams and A&W argue that it is irrelevant that Alexander had apparent authority to bind A&W to the Note in light of the district court's conclusion that there was no "meeting of the minds" between Stine Seed and A&W.  However, that conclusion depended in part on the court's determination that Alexander lacked authority to bind A&W to the Note.  Under Iowa law, "all acts and contracts of an agent, which are within the apparent scope of authority conferred on him or her, are also binding upon the principal."  Magnusson Agency v. Pub. Entity Nat'l Co.-Midwest, 560 N.W.2d 20, 25 (Iowa 1997).[4]  Thus, the verdict in favor of A&W on Stine Seed's breach of contract claim must be reversed and remanded to the district court for proceedings consistent with this opinion.

---

[4]Williams and A&W suggest that Illinois law, rather than Iowa law, controls whether an agent with apparent authority can bind the principal.  However, the result is the same under either state's law.  See State Sec. Ins. Co. v. Burgos, 583 N.E.2d 547, 551 (Ill. 1991) ("Apparent authority is that authority which a reasonably prudent person, in view of the principal's conduct, would naturally suppose the agent to possess. The principal, having created the appearance of authority, is estopped to deny it to the detriment of a third party." (internal citations omitted)).

### III. Conclusion

For the reasons set forth above, we reverse and remand the court's judgment in favor of A&W on Stine Seed's claim for breach of contract. We affirm the judgment in all other respects.

_____