**GREAT LAKES COMMUNICATION CORPORATION, Plaintiff,**

v.

**AT&T CORPORATION, Defendant.**

### No. C 13–4117–MWB

United States District Court,
N.D. Iowa, Western Division.

Signed August 21, 2015

828

Anthony Lee Osborn, Jeana L. Goosmann, Marie H. Ruettgers, Goosmann Law Firm, Sioux City, IA, George David Carter, Jr., Joseph Paul Bowser, Innovista

Law, PLLC, Ross Allen Buntrock, Arent Fox, LLP, Washington, DC, for Plaintiff.

Richard W. Lozier, Jr., Belin McCormick, P.C., Des Moines, IA, Benjamin Richard Brunner, Brian A. McAleenan, Sidley Austin, LLP, Chicago, IL, James Franklin Bendernagel, Jr., Michael Joseph Hunseder, Sidley Austin, LLP, Washington, DC, John C. Gray, Heidman Law Firm, LLP, Sioux City, IA, Letty S.D. Friesen, AT & T Services, Inc., Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT AGREEMENT

MARK W. BENNETT, U.S. DISTRICT COURT JUDGE, NORTHERN DISTRICT OF IOWA

### TABLE OF CONTENTS

I. INTRODUCTION . . . 829

 A. Procedural Background . . . 829

 B. Findings Of Fact . . . 830

II. LEGAL ANALYSIS . . . 834

 A. The Effect Of The Intervening Circumstance . . . 834

 1. Arguments of the parties . . . 834

 2. Analysis . . . 835

 B. Satisfaction Of The Mechanics Of Completing A Binding Agreement . . . 837

 1. Standards for contract formation . . . 838

 2. Requirement of a signed writing . . . 839

 a. Arguments of the parties . . . 839

 b. Analysis . . . 840

 3. Sufficiency of the offer . . . 845

 a. Arguments of the parties . . . 845

 b. Analysis . . . 845

 4. Counteroffer or inquiry . . . 848

a. *Arguments of the parties* ...848

b. *Analysis* ...849

III. *CONCLUSION* ...851

# I. INTRODUCTION

## A. Procedural Background

As I have previously explained, this case is, primarily, a billing dispute between two telecommunications companies, plaintiff Great Lakes Communications Corporation (GLCC), a "competitive local exchange carrier" or CLEC, and AT & T Corporation (AT & T), an "interexchange carrier" or IXC. The billing dispute is over charges to AT & T by GLCC for routing telephone calls to GLCC's purported "end users," who are "Free Calling Parties" or FCPs, resulting from what AT & T contends is "access stimulation." After Judge Donald E. O'Brien, to whom the case was previously assigned, entered his Order On Motions For Summary Judgment (docket no. 149), on June 8, 2015, only two claims remain at issue. The first is GLCC's claim, in part of Count II of its Complaint, for payments under its revised tariff that were not covered by a previous settlement agreement. The second remaining claim is AT & T's claim, in Count IV of AT & T's Counterclaim, for a refund of payments mistakenly made under GLCC's revised tariff. In his Order On Motions For Summary Judgment, Judge O'Brien deferred AT & T's request for referral of this action to the Federal Communications Commission (FCC), on the basis of that agency's "primary jurisdiction" over pertinent issues, and set a deadline of June 18, 2015, for further briefing of that issue. He then transferred the case to me, prior to a jury trial set to begin on July 13, 2015.

The parties subsequently filed briefs on the referral issue, in which AT & T requested that I refer four questions to the FCC, *see* AT & T's June 16, 2015, Brief In Support Of Referral To FCC Under Primary Jurisdiction Doctrine (docket no. 154), and GLCC opposed referring any of AT & T's questions to the FCC, *see* GLCC's June 18, 2015, Brief In Opposition To Primary Jurisdiction Referral (docket no. 162). If I did refer any of AT & T's proposed questions, however, GLCC requested that I also refer two other questions. *Id.* Because I was aware that the parties were involved in trial preparations, on Friday, June 26, 2015, I directed one of my law clerks to e-mail counsel for the parties that I would be filing a ruling on the referral issue the following Monday, but, for clerical reasons, I could not do so that day. My law clerk's e-mail to the parties (Referral E–Mail), sent at 3:58 p.m. (CDT) that day, informed the parties of the issues that I was referring to the FCC, that I would be staying the case, and that I would be continuing the jury trial indefinitely. My Memorandum Opinion And Order Regarding Referral To The FCC Under The Primary Jurisdiction Doctrine (Referral Order) (docket no. 183) was, in fact, filed June 29, 2015. On June 29, 2015, I entered another Order (docket no. 184) denying all pending motions without prejudice to reassertion if this matter eventually proceeds to trial in this court.

Although I had not anticipated further proceedings in this court so soon, GLCC filed a Motion To Enforce Settlement Agreement (docket no. 188), on July 9, 2015, seeking enforcement of a settlement agreement that GLCC contends the parties entered into on June 26, 2015. By Order (docket no. 191), filed July 14, 2015, I set an evidentiary hearing on GLCC's Motion for August 14, 2015. On July 27, 2015, AT & T filed its Opposition To [GLCC's] Motion To Enforce Settlement Agreement (docket no. 194), and, on August 4, 2015, GLCC filed its Reply (docket no. 198).

At the evidentiary hearing on August 14, 2015, GLCC presented the testimony of

two of its attorneys, Mr. Carter and Mr. Bowser, who had been involved in the settlement negotiations. AT & T presented the testimony of one of its attorneys, Mr. Hunseder, who had been involved in the settlement negotiations. The parties submitted joint exhibits, including declarations of Mr. Carter, Mr. Bowser, and Mr. Hunseder, and various settlement offers and e-mails that the parties had exchanged during their settlement negotiations prior to and shortly after the Referral E-mail.

At the conclusion of the evidentiary hearing, I invited the parties to submit letter briefs on the question of the effect of a recipient's subjective belief that he received a counteroffer and stated that I would permit the parties to submit letter briefs on the applicability of RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. a or cmt. b. On August 18, 2015, AT & T submitted a letter brief, by e-mail, on the question of whether the standard for determining whether GLCC made a counteroffer to AT & T is an objective or subjective one. That same day, GLCC submitted a letter brief, by both e-mail and filing, see docket no. 203, concerning both the question of whether the standard for determining whether an offer was made is objective or subjective and concerning whether this case falls under comment a or comment b of RESTATEMENT (SECOND) OF CONTRACTS § 27. In response to what AT & T considered GLCC's "supplemental brief," in the form of its letter brief, AT & T then submitted, by e-mail, another letter brief addressing three additional matters not addressed in its first letter brief.

Having reviewed the parties' submissions before and during the evidentiary hearing, and their letter briefs submitted after the evidentiary hearing, I now enter my ruling on GLCC's Motion To Enforce Settlement Agreement.

### B. Findings Of Fact

GLCC and AT & T exchanged a series of settlement offers, both before and after the commencement of this litigation. Those settlement offers included written offers or counteroffers in 2014. See Joint Exhibits 3(a)-(h). After a hiatus, settlement discussions resumed in mid-June of 2015, after Judge O'Brien's Order On Motions For Summary Judgment. See Joint Exhibits 4, 5, and 8. At no time in the course of any of their negotiations, however, did any party "bid against itself"—that is, make consecutive offers without an intervening counteroffer from the other party. In a settlement offer dated May 8, 2014, see Joint Exhibit 3(c), GLCC first inserted the following language: "A settlement and release of claims will be contingent upon finalizing a formal written agreement executed by both parties." AT & T adopted identical language in its next offer, on May 19, 2014, see Joint Exhibit 3(d), and identical or nearly identical language appeared in every offer or counteroffer from both parties thereafter. See Joint Exhibits 3(e)-(h), 4, 5, and 8.

Focusing on the most recent round of settlement negotiations, I find that the parties' settlement negotiations resumed after Judge O'Brien's Order On Motions For Summary Judgment with AT & T's offer on June 18, 2015, see Joint Exhibit 4, and GLCC's counteroffer on June 19, 2015, see Joint Exhibit 5. In an e-mail from Mr. Hunseder, dated June 22, 2015, AT & T informed GLCC's attorneys that "AT & T believes the parties are making progress," and that "AT & T intends to make a counteroffer," but, for a number of reasons, that counteroffer would not be forthcoming until the following day. See Joint Exhibit 6.[1]

---

1. AT & T refers to an upcoming "counteroffer" in this correspondence, but the parties

have referred to AT & T's eventual settlement

On June 25, 2015, before AT & T made any further offer, Mr. Carter sent Mr. Hunseder and Mr. Bendernagel, another of AT & T's attorneys, an e-mail, identified as a Confidential Settlement Communication, about both parties' "concerns about ensuring that settlement doesn't create undesirable incentives on either side." Joint Exhibit 7. In that e-mail, Mr. Carter set out "an example framework to see if it might help move the discussions forward," which included, in an attachment, certain specific terms as an example. *Id.* Mr. Carter's e-mail included the following disclaimer:

Please note that GLCC is not proposing the specific rates in our attachment and this does not constitute a formal settlement offer from GLCC to AT & T. Rather, it should be an [sic] understood as an example framework that might help to progress the discussions.

Joint Exhibit 7.

It was not until June 26, 2015, at approximately 2:46 p.m. (CDT), that Mr. Hunseder sent AT & T's new offer (June 26, 2015, Offer) to GLCC, as an attachment to an e-mail. Joint Exhibit 8. Mr. Hunseder prefaced AT & T's statement of the terms of its June 26, 2015, Offer, as follows:

I am writing to present a counteroffer settlement proposal that would resolve the above-captioned matter. As before, AT & T is prepared to move forward with trial in this matter. However, to avoid the expense associated with trial, AT & T is willing to enter into negotiations with [GLCC] to reach an agreement with GLCC.

Joint Exhibit 8. Although this preface states that AT & T made its June 26, 2015, Offer "to avoid the expense associated with trial," Mr. Hunseder never stated that AT

proposal, on June 26, 2015, as "the June 26, 2015, offer." I have followed their lead in the

& T's interest in settling the case was contingent on the court's resolution of the pending issue of referral to the FCC, nor did the June 26, 2015, Offer, itself, state that it would be revoked or rescinded if the court referred any issues to the FCC or if the trial was continued. On the other hand, counsel for the parties had discussed the possibility that the court's anticipated ruling on the referral issue could impact the parties' settlement positions.

In its June 26, 2015, Offer, AT & T requested a response "by close of business on June 29, 2015, if GLCC is amenable to settling on these terms." *Id.* AT & T's June 26, 2015, Offer also stated, "As indicated above, a settlement and release of the claims discussed above will be contingent upon finalizing a formal written agreement executed by both parties." *Id.* AT & T's June 26, 2015, offer also included the following footnote:

If the parties both agree that they have reached an agreement in principle but that a written settlement agreement needs to be finalized, the parties would notify the Court that they have an agreement in principle, and would ask for a temporary stay of any proceedings to finalize the terms of a written agreement.

Joint Exhibit 8, n.1.

At about 3:20 p.m. (CDT)—that is, about thirty-five minutes after Mr. Hunseder sent AT & T's June 26, 2015, Offer to GLCC—Mr. Bowser and Mr. Carter telephoned Mr. Hunseder to discuss the June 26, 2015, Offer. The parties' characterizations of that discussion and their allegations about what was conveyed or understood by the parties differ wildly. In essence, GLCC contends that its counsel made various inquiries about AT & T's

remainder of this ruling.

June 26, 2015, Offer in order to test the waters, so that GLCC could decide whether to make a counteroffer (with the understanding that it would be acceptable to AT & T) or to accept AT & T's June 26, 2015, Offer. On the other hand, AT & T contends that, during this call, GLCC made a counteroffer, on different terms from those offered by AT & T, thus terminating AT & T's June 26, 2015, Offer.

Somewhat more specifically, during the conference call, Mr. Carter and Mr. Bowser were at the offices of their local counsel in Sioux City, Iowa, while Mr. Hunseder was at his office in Washington, D.C. Both sides acknowledge that Mr. Hunseder made clear during the call that he did not have final authority from AT & T to settle the case, but neither Mr. Bowser nor Mr. Carter recalls making a similar disclaimer of authority to settle the case for GLCC. Mr. Bowser testified that he stated during the call that GLCC found AT & T's framework for settlement acceptable. On the other hand, Mr. Bowser also testified that he asked whether AT & T would consider a "split the difference" approach; whether AT & T would accept a "split the difference" proposal, if GLCC made one; whether this was AT & T's best offer; and how soon Mr. Hunseder might be able to get back to GLCC with answers to those questions. Mr. Bowser testified that he only provided examples of possible different terms with regard to AT & T's payment of the outstanding dispute and payment for retail traffic going forward, as part of the discussion of whether AT & T might be amenable to a "split the difference" approach and in response to a question from Mr. Hunseder about what a "split the difference" approach might look like. Mr. Bowser and Mr. Carter both testified that the parties discussed the potential for avoiding the need for Mr. Hunseder to travel to Sioux City for the pretrial conference scheduled for Monday, June 29, 2015.

On the other hand, while Mr. Hunseder admits that he indicated that AT & T had some room to move, he testified that he did so in response to GLCC's counteroffer and that the attorneys discussed how quickly AT & T might be able to respond to GLCC's counteroffer. Mr. Hunseder understood that GLCC was making a counteroffer that included specific, different amounts to settle the outstanding dispute and for "baseline" traffic during the first and second years going forward. While Mr. Hunseder may have sincerely believed that GLCC had made a counteroffer, AT & T did not present any evidence to corroborate his belief at the time, such as the testimony of another attorney in his firm, Mr. Bendernagel, to whom Mr. Hunseder said he reported, immediately after the conference call, that GLCC had made a counteroffer. As to AT & T's own June 26, 2015, Offer, Mr. Hunseder testified that he pointed out during the conference call that there were two alternative rates for traffic exceeding the "baseline," but AT & T's June 26, 2015, Offer did not indicate how GLCC was to determine which of those two rates should be billed or how the parties would correct for under- or over-billing. According to Mr. Hunseder, GLCC's counsel stated his belief that some type of "true-up" process for billing could be negotiated later.

At 3:58 p.m. (CDT)—that is, shortly after the conference call described above had ended—the parties received the Referral E–Mail from my law clerk, see Joint Exhibit 15, summarizing my Referral Order, which would be filed the following Monday, including notice that the case would be stayed and the trial continued indefinitely. At the time of the Referral E–Mail, I was not aware that the parties were engaged in any settlement negotiations, and I did not know that AT & T's June 26, 2015, Offer was pending. At 5:10 p.m. (CDT), just over an hour after receiving the Referral

E–Mail, Mr. Bendernagel called Mr. Bowser, and left a voice mail message on Mr. Bowser's office number asking Mr. Bowser to call him back. *See* Joint Exhibit 13 (voice mail recording). That voice mail was "pushed" to Mr. Bowser's e-mail, which he could pick up on his mobile telephone. At the time of that voice mail, however, Mr. Bowser and Mr. Carter, who had returned to their hotel in Sioux City from the offices of their local counsel, were engaged in a telephone call with their client, which lasted from 5:06 p.m. to 5:17 p.m. *See* Joint Exhibit 14 (timeline). Mr. Bowser testified that he only discovered the voice mail from Mr. Bendernagel after the conclusion of the call with Mr. Carter to their client. While Mr. Bowser and Mr. Carter were still on the telephone with their client, and at the client's direction, Mr. Carter sent Mr. Hunseder an e-mail, dated June 26, 2015, at 5:12 p.m. (CDT), which stated, "Great Lakes accepts AT & T's latest settlement offer." Joint Exhibit 9. Mr. Bowser and Mr. Carter testified that they understood that, with the additional delay occasioned by the referral of issues to the FCC, AT & T would be unlikely to agree to pay any more than it had offered. Thus, they testified that they believed that there was no longer any reason to wait to hear from Mr. Hunseder on the questions that they had posed about AT & T's June 26, 2015, Offer or to prepare a counteroffer before responding to AT & T's June 26, 2015, Offer.

Mr. Bowser returned the call from Mr. Bendernagel at 5:25 p.m. (CDT), pursuant to Mr. Bendernagel's request in his voice mail, but that was after GLCC had already responded by e-mail to AT & T's June 26, 2015, Offer. Mr. Bowser testified that Mr. Bendernagel said, "Joe, it's kind of difficult to talk to you right now," which Mr. Bowser testified was unusual. Transcript of August 14, 2015, Hearing, 82:9. Mr. Bowser testified that Mr. Bendernagel "probe[d] me about whether I didn't think

our call with Mr. Hunseder wasn't a counteroffer," but Mr. Bowser testified "that was the first time it had occurred to him that someone would think that, so I denied it." *Id.* at 82:15–18. On the other hand, Mr. Bowser testified that he did agree with Mr. Bendernagel's characterization of the court's referral of issues to the FCC as a "big deal" before that call ended. *Id.* at 18–21.

Later that evening, at 6:40 p.m. (CDT), Mr. Hunseder sent Mr. Carter and Mr. Bowser the following e-mail responding to GLCC's purported acceptance of AT & T's June 26, 2015, Offer:

> [Mr. Carter],
>
> As you know, you and [Mr. Bowser] called me at about 4:20 ET today, and you did not accept AT & T's offer in my most recent email below. Rather, you said that GLCC proposed for AT & T to pay GLCC $[-.-] million, and that Great Lakes proposed for the "direct connect" rates under the proposed contract going forward to be $[-.——] for the first year and $[-.——] for the second year. I did not accept GLCC's counteroffer, but told you I would take it to my client and try to get a response today.
>
> By making a counteroffer with the new settlement amount and the new rates, GLCC rejected AT & T's offer. As a consequence, your email below is not a valid acceptance of AT & T's previous offer. Further, and in any event, the email from the Court dated at around 5 pm ET, in which it indicated that it was referring issues to the FCC, staying the case, and adjourning the trial, is an intervening event that affects the parties' negotiations.
>
> While there is no agreement between the parties, AT & T is willing to consider your most recent email below as another counteroffer. Further, as [one of AT & T's attorneys] Jim Bendernagel told

[Mr. Bowser], AT & T is willing to continue discussions aimed at resolving this matter. In light of the Court's stay, it believes those discussions should be resumed at a later time. At the current time, the parties have no agreement to resolve the matters in dispute.

Thank you, and please call me if you have any questions.

[Mr. Hunseder]

Joint Exhibit 10.

The parties agree that they had no further communication regarding settlement until July 3, 2015, but those discussions did not resolve the parties' dispute about whether or not they had reached a settlement on June 26, 2015. Consequently, on July 9, 2015, GLCC filed the Motion To Enforce Settlement Agreement now before me.

## II. LEGAL ANALYSIS

### (Including some further findings of fact)

As the case is presented by the parties, there are three potentially dispositive issues to be resolved in order to determine whether or not the parties entered into a binding settlement agreement on June 26, 2015. Those three issues are the following: (1) whether GLCC made a "counteroffer" during the discussion of AT & T's June 26, 2015, Offer; (2) whether the Referral E–Mail—providing notice of the content of my Referral Order, to be filed the following Monday—was a sufficient change of circumstances to revoke AT & T's June 26, 2015, Offer; and (3) whether AT & T's June 26, 2015, Offer required the execution of a written agreement to be enforceable. From the record, however, I find that another potentially dispositive issue is whether the June 26, 2015, Offer was sufficiently complete to create a contract, if accepted.

Most of the issues presented concern the mechanics of contract formation in light of the parties' conduct. The one issue that is

different concerns the effect of an intervening circumstance, the Referral E–Mail, which gave notice of my intent to refer issues to the FCC, stay the case, and continue the jury trial indefinitely. I will consider that issue first.

### A. The Effect Of The Intervening Circumstance

As explained, above, the Referral E–Mail was delivered to the parties shortly after they ended a conference call about AT & T's June 26, 2015, Offer. Assuming, for the moment, that AT & T's June 26, 2015, Offer and GLCC's response could have formed a contract (which also means assuming that GLCC did not make a counteroffer), the Referral E–Mail arrived before GLCC's purported acceptance of AT & T's June 26, 2015, Offer. AT & T argues, however, that the Referral E–Mail cut off GLCC's ability to accept the June 26, 2015, Offer, which GLCC denies.

### 1. Arguments of the parties

More specifically, GLCC argues that the Referral E–Mail is not one of the four methods of terminating an offer, which it contends are rejection or counteroffer, lapse, revocation, and death or incapacity of the offeror. GLCC also argues that the Referral E–Mail did not amount to the occurrence or non-occurrence of a circumstance on which AT & T's June 26, 2015, Offer was conditioned. GLCC acknowledges that Mr. Hunseder's e-mail at 6:40 p.m. (CDT) on June 26, 2015, in response to GLCC's purported acceptance, makes clear that AT & T no longer wanted to settle on the terms that AT & T had offered, in light of the notice of my Referral Order in the Referral E–Mail. Nevertheless, GLCC argues that AT & T had never conditioned its June 26, 2015, Offer on my disposition of the pending referral issue, so AT & T could not then revoke the June 26, 2015, Offer. Indeed, GLCC ar-

gues that the Eighth Circuit Court of Appeals has held that an intervening court order does not cut off a party's right to accept an open settlement offer, citing *Perkins v. U.S. West Communications,* 138 F.3d 336 (8th Cir.1998).

In response, AT & T shifts the focus somewhat, from the effect of my disposition of the referral issue itself to the other consequences of the Referral E–Mail and the Referral Order. Specifically, AT & T argues that GLCC knew that the entire premise of the parties' negotiations was to avoid the expense associated with trial. AT & T argues that premise was defeated when my law clerk notified the parties in the Referral E–Mail that I would stay the case and continue the upcoming jury trial indefinitely. AT & T argues that GLCC's attorneys conceded that they understood, in light of the Referral E–Mail, that there was no reason to wait to hear from AT & T's counsel for an answer to GLCC's inquiries about AT & T's June 26, 2015, Offer, because it was clear that AT & T would not improve on that Offer. AT & T argues this concession shows that GLCC understood that the Referral E–Mail changed the circumstances sufficiently to terminate AT & T's June 26, 2015, Offer. So, too, AT & T argues, does Mr. Bowser's avoidance of a response to the voice mail that Mr. Bendernagel left for Mr. Bowser after the Referral E–Mail until after GLCC had sent the e-mail purportedly accepting AT & T's June 26, 2015, Offer.

In reply, GLCC argues that AT & T never conditioned its June 26, 2015, Offer upon the court's ruling on the referral issue, never revoked that Offer, and never communicated its inability to comply with the terms of its June 26, 2015, Offer in light of my Referral Order. Consequently, GLCC argues, the Referral E–Mail, giving notice that I would refer issues to the FCC, stay the case, and continue the jury trial indefinitely, simply did not extinguish AT & T's June 26, 2015, Offer. Indeed, GLCC disputes that the stay deprived AT & T of the potential benefit of avoiding the expense associated with trial, because a trial in federal court on remaining issues was likely, even if the FCC resolved the questions referred to it. GLCC disputes AT & T's suggestion that Mr. Bowser avoided responding to Mr. Bendernagel's voice mail and contends that, in fact, Mr. Bowser responded as soon as he discovered the voice mail after concluding a conference call with his client. Moreover, GLCC points out that Mr. Bendernagel's voice mail did not convey any revocation of AT & T's June 26, 2015, Offer, but merely consisted of a request that Mr. Bowser call back.

### 2. Analysis

GLCC relies on *Perkins v. U.S. West Communications,* 138 F.3d 336 (8th Cir. 1998), as demonstrating that the Referral E–Mail, giving notice of my Referral Order, did not revoke AT & T's June 26, 2015, Offer or cut off GLCC's ability to accept that Offer. I conclude that *Perkins* does not stand for the broad proposition for which GLCC cites it and is, at best, of limited persuasive value, here.

In *Perkins,* the Eighth Circuit Court of Appeals considered whether an offer of judgment pursuant to Rule 68 of the Federal Rules of Civil Procedure must be considered "open" for the full ten days mandated by the rule, notwithstanding the intervening entry of summary judgment by the court, where the court was unaware that such an offer had been made. 138 F.3d at 337–38. The court held that, in light of the purposes and the plain language of Rule 68, the rule "mandates that an offer of judgment remain valid and open for acceptance for the full ten-day period outlined in the Rule despite an intervening grant of summary judgment by

the district court." *Id.* at 339. The court also observed that, because the offeror had not conditioned the offer of judgment upon the district court's not granting the summary judgment motion prior to the recipient's acceptance of the offer of judgment, the offeror assumed the risk that the district court would rule in favor of the offeror on its summary judgment motion. The court concluded that the offeror's "unpleasant surprise" that it could have brought the litigation to an end for less money than it had offered pursuant to Rule 68 by waiting for a summary judgment ruling did not establish grounds for invalidating the offer of judgment or the recipient's acceptance of it. *Id.* at 339–340.

■ Here, AT & T's June 26, 2015, Offer was not an "offer of judgment" pursuant to Rule 68, like the one at issue in *Perkins.* Thus, unlike the "offer of judgment" in *Perkins,* there was no procedural rule in this case controlling how long the June 26, 2015, Offer had to remain open, no matter what circumstances or action by the court might intervene. *Compare id.* at 337–39. At most, I find *Perkins* to be instructive that an offeror of a settlement agreement, like an offeror of an "offer of judgment" pursuant to Rule 68, who does not condition a settlement offer on the occurrence or non-occurrence of certain circumstances while the offer is open may not avoid the consequences of a valid acceptance when the circumstances do or do not occur. *Cf. id.* at 339–40. AT & T certainly did not expressly condition its June 26, 2015, Offer on any possible disposition by the court of AT & T's pending request to refer issues to the FCC.

GLCC stands on firmer ground by arguing that RESTATEMENT (SECOND) OF CONTRACTS § 36 identifies the methods of termination of a recipient's power of acceptance of an offer. As numerous citations, *infra,* will demonstrate, Iowa courts have repeatedly relied on the RESTATEMENT (SECOND) OF CONTRACTS as stating or as consistent with the principles of Iowa contract law. RESTATEMENT (SECOND) OF CONTRACTS § 35(1) explains that "[a] contract cannot be created by acceptance of an offer after the power of acceptance has been terminated in one of the ways listed in § 36." RESTATEMENT (SECOND) OF CONTRACTS § 36, in turn, states the following concerning methods of termination of the power of acceptance:

(1) An offeree's power of acceptance may be terminated by

 (a) rejection or counter-offer by the offeree, or

 (b) lapse of time, or

 (c) revocation by the offeror, or

 (d) death or incapacity of the offeror or offeree.

(2) In addition, an offeree's power of acceptance is terminated by the non-occurrence of any condition of acceptance under the terms of the offer.

RESTATEMENT (SECOND) OF CONTRACTS § 36. GLCC is correct that an intervening court order is conspicuous by its absence from the list of methods of termination of an offer in § 36. Although comment *c* to this section explains that an offer may also be terminated by impossibility and illegality, *see id.* cmt. *c.,* AT & T does not argue any of the circumstances identified in that comment occurred in this case.

■ Just as importantly, while AT & T seems to suggest that RESTATEMENT (SECOND) OF CONTRACTS § 36(2) is applicable here, and demonstrates that GLCC's power to accept AT & T's June 26, 2015, Offer terminated when I notified the parties that I would be continuing the pending trial date indefinitely and referring issues to the FCC, I disagree. Section 36(2) explains that the power to accept an offer is terminated by the non-occurrence of any

condition of acceptance "under the terms of the offer." AT & T may have had a "secret" intention that it would not settle the case if I referred any issues to the FCC and stayed the case. In its June 26, 2015, Offer, however, AT & T did not expressly condition GLCC's power of acceptance—that is, state such a condition "under the terms of the offer," RESTATEMENT (SECOND) OF CONTRACTS 36(2)—on my granting or denying AT & T's request for referral of issues to the FCC or upon the case proceeding to trial as scheduled. As the Iowa Supreme Court has explained, "[e]vidence of the parties' mutual intent is what matters" to whether or not they entered into a contract and the meaning of contract terms. *Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011). Furthermore, " '[i]n searching for that intention, we look to what the parties did and said, rather than to some secret, undisclosed intention they may have had in mind, or which occurred to them later.' " *Id.* (quoting *Waechter v. Aluminum Co. of America*, 454 N.W.2d 565, 568–69 (Iowa 1990)); *see also Schaer v. Webster County*, 644 N.W.2d 327, 338 (Iowa 2002) (explaining that mutual assent to a contract is based on objective evidence, not the hidden intent of the parties). If AT & T had some "secret" intent not to settle if any issues were referred to the FCC or if the trial was continued, that "secret" intent is simply irrelevant.

Also, while AT & T is correct that "[a]n offer may be withdrawn by a communication prior to acceptance which expressly or by implication notifies the offeree that the offeror does not intend to perform the contract," *Emmons v. Ingebretson*, 279 F.Supp. 558, 573 (N.D.Iowa 1968), that proposition is of no help to AT & T, here. AT & T gave no notice, express or implied, that it did not intend to perform a settlement on the terms stated in its June 26, 2015, Offer, *before* GLCC purportedly accepted the offer. AT & T

did state, in the preface to its June 26, 2015, Offer, that it was "willing to enter into negotiations with [GLCC] to reach an agreement" so that AT & T could "avoid the expense associated with trial." *See* Joint Exhibit 8. I simply do not find such a statement to constitute adequate express or implied prior notice of intent not to perform if the imminent jury trial, set to begin on July 13, 2015, was continued. *Compare id.* Moreover, as GLCC points out, continuing the jury trial indefinitely did not necessarily amount to a failure of the "entire premise" on which AT & T was willing to enter into a settlement agreement. Here, there was simply no certainty that continuing the scheduled July 13, 2015, jury trial or referring issues to the FCC would ultimately "avoid the expense associated with trial," let alone avoid the expense of further litigation, where a trial to resolve some issues remained likely, whatever the FCC's resolution might be of the issues referred to it.

AT & T cannot avoid the effect of GLCC's purported acceptance of AT & T's June 26, 2015, Offer on the ground that the Referral E–Mail, which summarized the Referral Order to be filed the following Monday, changed the circumstances sufficiently to terminate AT & T's June 26, 2015, Offer. Therefore, I turn to other issues to determine whether or not the parties reached a binding settlement agreement on June 26, 2015.

### B. Satisfaction Of The Mechanics Of Completing A Binding Agreement

As I noted, above, the remaining issues involve the mechanics of contract formation in light of the parties' conduct. Before resolving those issues, I will summarize the legal standards generally applicable to determining the enforceability of a purported settlement agreement.

### 1. Standards for contract formation

"Settlement agreements are generally construed according to the principles of contract law." *Myers v. Richland County*, 429 F.3d 740, 749 (8th Cir.2005); *Phipps v. Winneshiek County*, 593 N.W.2d 143, 146 (Iowa 1999) (explaining that, under Iowa law, settlement agreements are essentially contractual in nature). Contract interpretation, in turn, is ordinarily a matter of state law. *See Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). Thus, the Eighth Circuit Court of Appeals has explained,

> We apply [the forum state's] law to determine whether a settlement agreement was formed. *See, e.g., State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apts., L.C.*, 572 F.3d 511, 514 (8th Cir. 2009) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) for the proposition that federal courts sitting in diversity apply the law of the forum state). "The district court's finding that a settlement offer was made and accepted is a factual one." *Enter. Rent–A–Car Co. v. Rent–A–Wreck of Am., Inc.*, 181 F.3d 906, 909 (8th Cir.1999) (citation omitted). "We review the district court's factual findings for clear error." *Id.* (citations omitted). On the other hand, the "[e]xistence of a valid contract is a question of law," subject to de novo review. *In re Estate of Neiswender*, 616 N.W.2d 83, 86 (S.D.2000) (citation omitted). We review de novo a district court's interpretation and construction of a contract, as well as a district court's interpretation of state law. *See, e. g., Cardinal Health 110, Inc. v. Cyrus Pharm., LLC*, 560 F.3d 894, 898 (8th Cir.2009); *Read v. McKennan Hosp.*, 610 N.W.2d 782, 786 (S.D.2000).

*American Prairie Constr. Co. v. Hoich*, 594 F.3d 1015, 1023 (8th Cir.2010) (applying South Dakota law); *see also Larken, Inc. v. Wray*, 189 F.3d 729, 732 (8th Cir. 1999) (in a diversity case, a settlement agreement must be construed according to state law); *In re Marriage of Kimbro*, 826 N.W.2d 696, 700 (Iowa 2013) (reviewing *de novo* whether an agreement existed under Iowa law).

More specifically, Iowa courts utilize contract principles when interpreting settlement agreements. *Phipps*, 593 N.W.2d at 146. Under Iowa law, the "cardinal rule" of contract interpretation—including interpretation of a settlement agreement—"is to determine the intent of the parties at the time they entered into the contract." *Peak*, 799 N.W.2d at 544 (citing *Waechter*, 454 N.W.2d at 568). As I explained, above, intent of the parties does not depend on any "secret" or "hidden" intent that the parties may have harbored, but on what they said and did at the time. *Id.*; *Schaer*, 644 N.W.2d at 338. Also, " '[w]hen the interpretation of a contract depends on the credibility of extrinsic evidence or on a choice among reasonable inferences that can be drawn from the extrinsic evidence,' " as it does here, " 'the question of interpretation is determined by the finder of fact.' " *Id.* (quoting *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008)).

Contract formation requires both "mutual intent" to be bound and "mutual assent" to the terms of the contract. "Mutual intent" means a "meeting of the minds." *Peak*, 799 N.W.2d at 544 (citing *Schaer*, 644 N.W.2d at 338); *but see Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (describing "mutual assent" as requiring objective evidence of a "meeting of the minds"). To show that there has been a "meeting of the minds," "the contract terms must be suffi-

ciently definite for the court to determine the duty of each party and the conditions of performance." *Royal Indem. Co.*, 786 N.W.2d at 846. To be bound, "contract parties must manifest mutual assent to the terms of the contract." *Rick v. Sprague*, 706 N.W.2d 717, 724 (Iowa 2005). Under Iowa law, the mode of assent for a contract, including a settlement agreement, is offer and acceptance. *Id.* ("This assent is usually given through the offer and acceptance."); *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001) ("A binding contract requires an acceptance of an offer."); *accord Allied Mut. Ins. Co. v. Colby Dev. Co.*, 669 N.W.2d 261, 2003 WL 21458353, *5 (Iowa Ct.App.2003) (table op.) (applying this requirement to a settlement agreement).

I will explore the nature of an "offer," "acceptance," and "counteroffer" in more detail, below. For now, suffice it to say that an agreement to agree to enter into a contract or settlement agreement does not form a contract, unless all the terms and conditions of the contract are agreed on and nothing is left to future negotiations. *Crowe–Thomas Consulting Group, Inc. v. Fresh Pak Candy*, 494 N.W.2d 442, 444–45 (Iowa Ct.App.1992).

With these general principles in mind, I turn to consideration of the issues involving the mechanics of contract formation that are determinative of whether or not the parties reached an enforceable settlement agreement on June 26, 2015.

### 2. Requirement of a signed writing

I indicated at the evidentiary hearing on August 14, 2015, that I find the dispositive issue, here, to be whether a signed written agreement was required to bind the parties to a settlement agreement on the terms of the June 26, 2015, Offer. After further review of the evidence and consideration of the parties' post-hearing letter briefs, I remain convinced that this is the key issue, here.

#### a. Arguments of the parties

GLCC argues that the intent of the parties to have a signed written settlement agreement, which GLCC concedes is apparent from various statements in their correspondence exchanging settlement terms, does not mean that its acceptance of AT & T's June 26, 2015, Offer was not binding. Rather, GLCC argues that this is a case covered by RESTATEMENT (SECOND) OF CONTRACTS § 27, comment *a*, which explains that it is possible to make a binding contract in which one of the terms is subsequent execution of a final writing. Under the circumstances presented, here, GLCC argues that a signed writing was a mere formality and redundant of the terms of AT & T's June 26, 2015, offer, which were completely set forth in that Offer.

AT & T responds that this is not a "comment *a* case," but a "comment *b* case," citing RESTATEMENT (SECOND) OF CONTRACTS § 27, comment *b*, which explains that there is no binding agreement in the absence of a signed written agreement, where the agreement is incomplete and either party knows that the other does not intend to be bound in the absence of a signed written agreement. AT & T argues that the circumstances, here, made clear that AT & T had no intention to be bound absent a signed written agreement, pointing to the caveats set out in the letter conveying the terms of the June 26, 2015, Offer. AT & T also argues that, in light of the parties' history of negotiations, the settlement was of a type usually put in writing, it was for a very large amount of money, and the negotiations had spanned a lengthy period of time. AT & T argues that GLCC wants it both ways, admitting that the parties had a practice of exchanging offers in writing, but arguing that no signed writing was required for acceptance

of an offer or creation of a binding contract.

In reply, GLCC reiterates that the parties' intent to have a further signed agreement does not vitiate the enforceability of the contract formed by the June 26, 2015, Offer. and acceptance. GLCC argues that the June 26, 2015, Offer was not for an agreement to agree, but for a full and complete agreement as to all essential, material terms. GLCC argues that the completeness of the agreement, not whether the parties contemplated a further written agreement, is what distinguishes a "comment a case" from a "comment b case." GLCC argues that the footnote in the June 26, 2015, Offer, which states that the parties would seek a stay to finalize the agreement, if they reached an agreement in principle, demonstrates that the June 26, 2015, Offer included all necessary material terms, including an obligation to execute a final writing. GLCC argues that the settlement terms were not so complex, nor did the possible settlement involve such a significant amount of money, that a writing was required for a binding settlement, where what is at issue is essentially a simple services contract. Thus, GLCC contends that, while a writing was contemplated, the full expression of the parties' agreement was found in AT & T's June 26, 2015, Offer. GLCC also argues that the length of the negotiations was not the result of complexity of the agreement, but the "maelstrom of litigation" surrounding the parties' dispute. GLCC also points out that the agreement was negotiated by counsel, not by the parties entering into an agreement to agree, then seeking the aid of counsel to memorialize the agreement.

In its post-hearing letter brief, GLCC reiterates that both comment a and comment b to RESTATEMENT (SECOND) OF CONTRACTS § 27 contemplate reduction of the parties' agreement to a signed written contract, but that what separates the two situations described in those comments is whether the parties had reached a complete agreement. GLCC points out that AT & T's e-mail disputing the effectiveness of GLCC's purported acceptance never challenged GLCC's right to accept on the basis that the parties had not memorialized their agreement in a signed writing or on the basis that the agreement lacked any material terms. GLCC also argues that the evidence shows that AT & T's June 26, 2015, Offer "equivocates" on whether a signed agreement was required, because it states, "If the parties both agree ... that a written agreement needs to be finalized. . . ." On the other hand, GLCC argues that the record is clear that the parties had reached a complete, binding agreement, making a signed writing a mere formality.

### b. Analysis

I conclude that the parties are correct that whether or not a signed written agreement was required may be settled by reference to RESTATEMENT (SECOND) OF CONTRACTS § 27 and its comments. Indeed, the Iowa Supreme Court has addressed, in some detail, the differences between a "comment a case" and a "comment ·b case" within the meaning of RESTATEMENT (SECOND) OF CONTRACTS § 27.

The Iowa Supreme Court's decision in *Horsfield Construction, Inc. v. Dubuque County, Iowa,* 653 N.W.2d 563 (Iowa 2002), which examines RESTATEMENT (SECOND) OF CONTRACTS § 27, is instructive on whether a purported offer that contemplates a written agreement can be accepted and create a binding contract prior to execution of the writing. *See also Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr. Co.,* 816 F.Supp.2d 631, 688 (N.D.Iowa 2011) (discussing *Horsfield*'s consideration of § 27, cmts. a and b ). In *Horsfield,* the Iowa Supreme Court explained,

This court has adopted Restatement (Second) of Contracts, section 27, which provides:

Manifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but the circumstances may show that the agreements are preliminary negotiations.

Restatement (Second) Of Contracts § 27 (1981); *Faught v. Budlong*, 540 N.W.2d 33, 35 (Iowa 1995). Comments *a* and *b* to section 27 are critical to an understanding of this general rule. Comment *a* provides:

Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by *exchange of several writings*. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, *they have then concluded the contract*.

Restatement (Second) Of Contracts § 27 cmt. *a* (emphasis added); *Faught*, 540 N.W.2d at 35.

Comment *b* provides:

On the other hand, if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form, the preliminary negotiations and agreements do not constitute a contract.

Restatement (Second) Of Contracts § 27 cmt. *b; Faught*, 540 N.W.2d at 35.

Factors that bear on whether a contract has been concluded include the following:

the extent to which express agreement has been reached on all the terms to be included, whether the contract is of a type usually put in writing, whether it needs a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, whether a standard form of contract is widely used in similar transactions, and whether either party takes any action in preparation for performance during the negotiations.

Restatement (Second) Of Contracts § 27 cmt. *c; Faught*, 540 N.W.2d at 36.

*Horsfield*, 653 N.W.2d at 570–71; *see also Nationwide*, 816 F.Supp.2d at 688–89 (quoting this portion of *Horsfield*).

In *Horsfield*, the Iowa Supreme Court found that one party's bid was complete and that the parties would not be agreeing to any new terms or conditions upon signing a formal contract; that the party receiving the bid unconditionally approved the bid, with no mention that it was subject to a written contract to be entered into later; that, in these circumstances, the "contract" document to follow was "a mere formality and redundant to [one party's] bid and the [other party's] approval"; and that the bidding party had taken steps to perform. 653 N.W.2d at 571–72. These facts led the Iowa Supreme Court "to conclude as a matter of law that the parties intended to be bound when the Board accepted HCI's bid and that the written contract called for by the statute was in-

tended only as a memorial of their agreement." *Id.* at 572. I reached a similar conclusion, based on the presence of several similar circumstances, in *Nationwide,* 816 F.Supp.2d at 633 (finding a final agreement, prior to execution of a written agreement, because no additional terms were contemplated and there was no indication that one party's approval of the other party's bid was subject to some further written contract, the contract was thorough and specific as to its terms, and the bidding party began work in reliance on the parties' agreement prior to execution of any writing).

Contrary to GLCC's contentions, I do not read either RESTATEMENT (SECOND) OF CONTRACTS § 27 or its comments—or, for that matter, *Horsfield*—to suggest that the completeness of the agreement is what separates a "comment *a* case" from a "comment *b* case," or, to put it another way, that a complete agreement can "trump" an intent not to be bound in the absence of a signed writing. If anything, I reach the contrary conclusion, for two reasons.

 First, as mentioned above, the "cardinal rule" of contract interpretation, including whether or not the parties have entered into a contract, is not "completeness" of the terms of the agreement, but "the intent of the parties at the time they entered into the contract." *Peak,* 799 N.W.2d at 544 (citing *Waechter,* 454 N.W.2d at 568). Second, I do not believe that comments *a* and *b* can be read to support GLCC's interpretation of "completeness" as the key distinction between the situations they describe. Comment *a* does state, "If parties have definitely agreed that they will [execute subsequently a final writing], and that the final writ-

ing shall contain these [agreed] provisions and no others, they have then concluded the contract." RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *a.* Nevertheless, comment *b* reads as a caveat or exception to the circumstances in comment *a,* beginning with "On the other hand...." RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *b.* Thus, as I read the two comments, notwithstanding that the parties may have agreed upon all of the terms that they plan to incorporate into a final writing—*i.e.,* the comment *a* circumstances—"if either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist until other terms are assented to or until the whole has been reduced to another written form"—*i.e.,* the comment *b* circumstances—"the preliminary negotiations and agreements do not constitute a contract." *Id.* In other words, comment *b* describes a situation in which one party's intent not to be bound in the absence of a signed written agreement is controlling: Where the other party "knows or has reason to know" that is the first party's intent. *Id.* I also do not read the linkage of the "incompleteness" and "intent that no obligation shall exist" conditions in comment *b,* using "and" as the conjunction, to mean that incompleteness of *terms* of the agreement is required before the "intent that no obligation shall exist" has any effect. [2] This is so, because comment *b* identifies two conditions *in the disjunctive* as sufficient to establish "completeness" of the agreement and to establish the "intent that an obligation shall exist": *either* "other terms are assented to" *or* "the whole has been reduced to another written form."

---

**2.** The obverse of requiring "incompleteness" of the *terms* of the agreement before the "intent that no obligation shall exist" has any effect would be that an "intent that no obli-

gation shall exist" is irrelevant if the terms of the agreement are "complete," which seems to be what GLCC argues.

Here, I conclude that GLCC knew or had reason to know that AT & T regarded the June 26, 2015, Offer as incomplete and intended that no obligation would exist until other terms were assented to or until the whole agreement had been reduced to writing and signed, within the meaning of RESTATEMENT (SECOND) OF CONTRACTS § 27, comment *b*. Mr. Hunseder made clear, during the conference call with Mr. Carter and Mr. Bowser, that he believed that the June 26, 2015, Offer was incomplete, because it did not address how GLCC was to determine which of two rates should be billed for traffic over the "baselines" or how the parties would correct for under- or over-billing. He also specifically invited GLCC's views on whether those terms should be negotiated then. Thus, the circumstances, here, fit the first impediment to the binding effect of a "complete" agreement in the absence of a signed writing, where one party, GLCC, knew or had reason to know that the other party, AT & T, regarded the agreement as incomplete. RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *b*. I will return, *infra*, to the parties' dispute about whether the terms that AT & T contends were missing were essential, material terms of the settlement agreement. For the purposes of § 27, and comment *b*, it is sufficient to conclude that GLCC knew or had reason to know that AT & T regarded the June 26, 2015, Offer as incomplete, because that Offer did not address these terms.

More importantly, AT & T's June 26, 2015, Offer made clear—and GLCC, therefore, knew or had reason to know—that AT & T intended that no obligation would exist until the whole agreement had been reduced to another written form. *Id.* This is so, for several reasons.

First, AT & T's June 26, 2015, Offer expressly stated, "As indicated above, a *settlement* and release of the claims discussed above *will be contingent upon finalizing a formal written agreement executed by both parties.*" Joint Exhibit 8 (emphasis added). A statement that a settlement is "contingent" upon execution of a signed written agreement is more than an acknowledgement that the parties will ultimately memorialize their agreement in a writing; it is an express statement that there is no binding agreement in the absence of a signed writing. In other words, from this language, GLCC "either kn[e]w[ ] or ha[d] reason to know that [AT & T] regard[ed] the agreement as incomplete and intend[ed] that no obligation shall exist . . . until the whole has been reduced to another written form"—*i.e.*, the comment *b* circumstances—so that "the preliminary negotiations and agreements d[id] not constitute a contract." RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *b*.

Second, in its June 26, 2015, Offer, AT & T requested a response "by close of business on June 29, 2015, if GLCC is *amenable* to settling on these terms." *Id.* (emphasis added). AT & T did not invite GLCC to notify AT & T by that deadline whether it "accepted the terms of the agreement." The ordinary meaning of "amenable" is "willing," *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 36 (10th ed.1995) (definition 2.c. of "amenable"), "tractable," or "capable of being won over," *see* Oxford English Dictionary, Online Edition, http://www.oed.com/view/Entry/6293?redirectedFrom= amenable# eid (definition 5 of "amenable"). Thus, AT & T's use of the phrase "amenable to settlement" reasonably indicated that AT & T was seeking an statement of willingness to pursue a final settlement, including the proposed terms, not an acceptance of a final offer.

Third, although GLCC contends that the language of footnote 1 to the June 26, 2015, Offer demonstrates AT & T's under-

standing that it would be bound in the absence of a signed writing, I reach the opposite conclusion. In that footnote, AT & T included an express reference to agreement to the terms in the June 26, 2015, Offer as creating "an agreement in principle," which would be the basis for a request for a stay from the court to "finalize the terms of a written agreement." Joint Exhibit 8, n.1. An "agreement in principle" is plainly not a "final agreement." Also, intent to seek "a temporary stay of any proceedings to finalize the terms of a written agreement," if an "agreement in principle" is reached, *id.* is a reiteration of AT & T's intent that only a signed written agreement would bind the parties. GLCC argues, in its letter brief, that this footnote is "equivocal" on whether a signed agreement is even required, because it states, "*If* the parties both *agree* that they have reached an agreement in principle but *that a written agreement needs to be finalized,*" then the parties would seek a temporary stay to finalize the terms of a written settlement. *Id.* (emphasis added). The language to which GLCC specifically points makes agreement by both parties that they have reached an agreement in principle and that a written agreement needs to be finalized requirements *for the parties to seek a temporary*

*stay from the court.* It does not, however, negate and is not contradictory to—but is entirely consistent with—AT & T's express statement, in the body of the June 26, 2015, Offer, that "a settlement and release of the claims discussed above will be contingent upon finalizing a formal written agreement executed by both parties." Joint Exhibit 8.[3]

Fourth, I am not persuaded to reach a different conclusion by GLCC's observation about the grounds identified by AT & T on June 26, 2015, for asserting that GLCC's acceptance was ineffective. It is true that, in his e-mail at 6:40 p.m. (CDT) on June 26, 2015, responding to GLCC's purported acceptance of AT & T's June 26, 2015, Offer, Mr. Hunseder does not challenge GLCC's right to accept the June 26, 2015, Offer on the basis that the parties had not memorialized their agreement in a signed writing or on the basis that the agreement lacked any material terms. *See* Joint Exhibit 10. GLCC cites no authority, and I have found none, that would require me to ignore the plain expression of AT & T's intent in its June 26, 2015, Offer not to be bound in the absence of a signed written agreement, simply because an attorney, in the heat of the moment, overlooked that issue, which I believe to be

---

3. GLCC also points out, in its letter brief, that Mr. Hunseder confirmed at the evidentiary hearing that neither party could deviate from any of the terms of AT & T's June 26, 2015, Offer, if GLCC accepted it, in the course of reducing the final agreement to writing. An "agreement in principle" on certain terms would likely preclude a party from attempting to renegotiate those terms, before signing a complete written agreement embodying those and other essential terms. *See* RESTATEMENT (SECOND) OF CONTRACTS § 26, cmt. *f* ("*Preliminary manifestations as terms of later offer.* Even though a communication is not an offer, it may contain promises or representations which are incorporated in a subsequent offer and hence become part of the contract made when the offer is accepted. Indeed, the pre-

liminary communication may thus form part of a written contract, or of a memorandum satisfying the Statute of Frauds, or of an integrated contract."); *but see id.* at § 27, cmt. *d* ("Even though a binding contract is made before a contemplated written memorial is prepared and adopted, the subsequent written document may make a binding modification of the terms previously agreed to."). What an agreement in principle addressing only certain terms would not do is prevent a party from refusing to sign a written agreement that was not complete as to all material terms, nor would it prevent a party from walking away from the entire agreement, if a written agreement could not be reached on all material terms.

the dispositive one and one for which there is a more than adequate evidentiary basis.

Finally, I find that the circumstances presented, here, in light of the factors set out on in comment *c* to RESTATEMENT (SECOND) OF CONTRACTS § 27 lead to a different conclusion than the ones reached in *Horsfield* and *Nationwide*.[4] *See Horsfield*, 653 N.W.2d at 570–71 (recognizing that these factors "bear on whether a contract has been concluded"). Again, I do not find that express agreement was reached on all of the terms to be included in a settlement agreement in this case. RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *c* (identifying this factor). I also find that a contract of the type and complexity at issue here, and involving the very substantial sums of money at issue (both immediately and going forward), would ordinarily be written or would ordinarily require a formal writing for its full expression. *Id.* The parties' recognition that further agreement would be required to determine which of two rates should be billed for traffic in excess of the "baselines" and how the parties would correct for under- or over-billing confirm these conclusions. Moreover, the June 26, 2015, Offer was not a common, usual, or "standard form" contract. *Id.* These factors all strongly suggest that a signed written agreement was required to bind the parties to a settlement agreement.

Therefore, I reject GLCC's contention that no signed writing was required to create an agreement based on the June 26, 2015, Offer, and I conclude, instead, that a signed writing was required to complete a settlement agreement between the parties. There was no such signed writing, so no binding settlement agreement was created on June 26, 2015.

### 3. Sufficiency of the offer
#### a. Arguments of the parties

Almost in passing, in its Opposition To [GLCC's] Motion To Enforce Settlement Agreement, AT & T raises the question of the sufficiency of its June 26, 2015, Offer to create a binding contract, if accepted. Specifically, in its Opposition, AT & T argues that the June 26, 2015, Offer was incomplete, because it did not include a mechanism to determine how to price traffic that exceeded the "baseline," or how the parties would correct for under- or over-billing.

In its Reply, GLCC argues that the June 26, 2015, Offer was a full and complete offer as to all essential material terms. GLCC also argues that the mechanics of how billing would occur going forward was not a material term, but one that the parties recognized could be resolved later.

In its post-hearing letter brief, GLCC also argues that the omitted terms on which AT & T relies were merely matters of "implementation" and not "essential elements" of any settlement agreement. In its second post-hearing letter brief, AT & T rejects the contention that these terms were not "essential," where GLCC raised them and described them as something that the parties would have to "revisit" in its June 26, 2015, correspondence; during

4. One of AT & T's contentions in its second letter brief, submitted by e-mail on August 18, 2015, is that GLCC failed to address in its letter brief any of the comment *c* factors, despite my indication at the evidentiary hearing that these factors were relevant to the determination of whether or not a signed written agreement was required, in this case, to create a binding settlement agreement. Whether or not GLCC addressed these factors, I find them relevant to the determination of whether or not the parties entered into an agreement on June 26, 2015. *See* RESTATEMENT (SECOND) OF CONTRACTS § 27, cmt. *c; Horsfield*, 653 N.W.2d at 570–71 (recognizing that these factors "bear on whether a contract has been concluded").

the conference call on June 26, 2015, Mr. Hunseder pointed out that such terms were missing from AT & T's June 26, 2015, Offer and asked if GLCC wished to "negotiate" them then, but GLCC's attorneys said they could be "negotiated" later; and these terms could make millions of dollars difference in the billings going forward.

### b. Analysis

As mentioned, above, to be bound, "contract parties must manifest mutual asset to the terms of the contract," and such assent "usually is given through the offer and acceptance." *Rick,* 706 N.W.2d at 724; *see also Rucker v. Taylor,* 828 N.W.2d 595, 602 (Iowa 2013) ("Mutual assent is ordinarily manifested through offer and acceptance, within our contract principles." (citing *Anderson v. Douglas & Lomason Co.,* 540 N.W.2d 277, 285 (Iowa 1995), and RESTATEMENT (SECOND) OF CONTRACTS § 22(1)). Just as some "secret intention" will not determine the proper interpretation of contract terms, *see Peak,* 799 N.W.2d at 544, " 'mutual assent [required to create a contract] is based on objective evidence, not the hidden intent of the parties.' " *Schaer,* 644 N.W.2d at 338 (quoting *Hill–Shafer P'ship v. Chilson Family Trust,* 165 Ariz. 469, 799 P.2d 810, 815 (1990), and also citing *Heartland Express, Inc.,* 631 N.W.2d at 268; *McCarter v. Uban,* 166 N.W.2d 910, 913 (Iowa 1969); and I E. Allan Farnsworth, FARNSWORTH ON CONTRACTS § 3.6, at 192–94 (2d ed.1998)). This objective standard considers " 'what a normally constituted person would have understood [the parties' words and actions] to mean, when used in their actual setting.' " *Rucker,* 828 N.W.2d at 602 (quoting *Anderson,* 540 N.W.2d at 286). Indeed, in their post-hearing letter briefs, the parties agree that the standard in deciding whether an offer (or counteroffer) has been made is an objective one, not a subjective one, citing, *inter alia, Phipps v. IASD Health Services Corp.,* 558 N.W.2d 198, 203 (Iowa 1997) ("We look for the existence of an offer objectively, not subjectively."); *Anderson,* 540 N.W.2d at 285; *Fairway Ctr. Corp. v. UIP Corp.,* 502 F.2d 1135, 1140 (8th Cir.1974); *Kopple v. Schick Farms, Ltd.,* 447 F.Supp.2d 965, 974 (N.D.Iowa 2006).

More specifically, "[a]n offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " *Anderson,* 540 N.W.2d at 285 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24, at 71 (1981)). "In other words, '[t]he test for an offer is whether it induces a reasonable belief in the recipient that he can, by accepting, bind the sender.' " *Rucker,* 828 N.W.2d at 602 (quoting *Anderson,* 540 N.W.2d at 285)). " '[T]he fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.' " *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(3) at 92, and also citing *Anderson,* 540 N.W.2d at 286). Also, RESTATEMENT (SECOND) OF CONTRACTS § 26 provides as follows:

> A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent.

For example, the Iowa Court of Appeals found that intent not to be bound before the parties had a signed agreement, within the meaning of § 26, was clearly indicated by a statement, in capital letters, on a purchase agreement that "THIS AGREEMENT IS NOT BINDING UNTIL ACCEPTED BY THE SELLING DEALER OR HIS AUTHORIZED REPRESENTA-

TIVE." *Desy v. Rhue,* 462 N.W.2d 742, 746 (Iowa Ct.App.1990).

Here, I conclude that AT & T's June 26, 2015, Offer was not sufficient to complete an agreement and bind the parties if GLCC accepted it. This is so, because, in the circumstances presented, viewed objectively, " 'a normally constituted person would [not] have understood [the parties' words and actions] to mean' " that GLCC could bind AT & T by accepting the June 26, 2015, Offer. *Rucker,* 828 N.W.2d at 602 (quoting *Anderson,* 540 N.W.2d at 286); *see also Anderson,* 540 N.W.2d at 285 (explaining that "[a]n offer is a 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it' " (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24, at 71 (1981)).

■ First, I reiterate my conclusion that one or more terms of the bargain proposed in the June 26, 2015, Offer were left open or uncertain, indicating that AT & T did not intend for it to be understood as a final and complete settlement agreement. *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(3) at 92, and also citing *Anderson,* 540 N.W.2d at 286). As Mr. Hunseder pointed out during the parties' conference call on the June 26, 2015, Offer, there were two alternative rates for traffic exceeding the "baseline," but AT & T's June 26, 2015, Offer did not indicate how GLCC was to determine which of those two rates should be billed or how the parties would correct for under- or over-billing. While GLCC contends that its counsel's comments that some type of "true-up" process for billing could be negotiated later show that these issues were not sufficiently significant or material to be essential terms of any settlement agreement, GLCC's concession that the terms could be negotiated later demonstrates that GLCC understood that the June 26,

2015, Offer was not sufficiently complete that assenting to it would bind the parties. I also agree with AT & T that these terms were "essential." GLCC raised these issues, and described them as something that the parties would have to "revisit," in its June 25, 2015, e-mail. *See* Joint Exhibit 7. During the conference call on June 26, 2015, Mr. Hunseder pointed out that such terms were still missing from AT & T's June 26, 2015, Offer and asked if GLCC wished to "negotiate" them then, but GLCC's attorneys said those terms could be "negotiated" later. Finally, as AT & T contends, these terms could make millions of dollars difference in the billings going forward.

Second, viewed objectively, the circumstances demonstrate that GLCC knew or should have known that AT & T did not intend to conclude a bargain until it had made a further manifestation of assent. RESTATEMENT (SECOND) OF CONTRACTS § 26. The June 26, 2015, Offer did not explicitly state, "THIS AGREEMENT IS NOT BINDING UNTIL ACCEPTED BY AT & T." *Cf. Desy,* 462 N.W.2d at 746. Nevertheless, as I explained, above, in Section II.B.2.b., it was clear that AT & T believed, and communicated to GLCC its belief, that the June 26, 2015, Offer was incomplete, because it did not address how GLCC was to determine which of two rates should be billed for traffic over the "baselines" or how the parties would correct for under- or over-billing. Again, I find that AT & T's June 26, 2015, Offer also included an express reference to agreement to the terms in the June 26, 2015, Offer as creating "an agreement in principle," which would require a stay from the court to "finalize the terms of a written agreement." Joint Exhibit 8, n.1. Again, I find that an "agreement in principle" is plainly not a "final agreement." Also, as I found above, in its June 26, 2015, Offer, AT & T also requested a response

"by close of business on June 29, 2015, if GLCC is *amenable* to settling on these terms." *Id.* (emphasis added). Again, I conclude that AT & T did not invite GLCC to notify AT & T by that deadline whether it "accepted the terms of the agreement." I reiterate my conclusion that the ordinary meaning of "amenable" is "willing," *see* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 36 (10th ed.1995) (definition 2.c. of "amenable"), "tractable," or "capable of being won over," *see* Oxford English Dictionary, On–Line Edition, http://www.oed.com/view/Entry/6293?redirectedFrom= amenable# eid (definition 5 of "amenable"), reasonably indicating that AT. & T was seeking an statement of willingness to pursue a final settlement, including the proposed terms, not an acceptance of a final offer.

Thus, the June 26, 2015, Offer did not offer a complete settlement agreement, and GLCC's purported acceptance of the June 26, 2015, Offer did not create a binding settlement agreement.

#### 4. Counteroffer or inquiry

In the alternative, I will consider the parties' remaining dispute about whether GLCC made a counteroffer during the June 26, 2015, conference call. GLCC denies making a counteroffer, while AT & T contends that GLCC did so, which extinguished AT & T's June 26, 2015, Offer, before GLCC purportedly accepted that Offer.

##### a. Arguments of the parties

GLCC argues that, in the discussion between counsel during the conference call after GLCC received AT & T's June 26, 2015, Offer, GLCC did not make a counteroffer. Rather, GLCC contends that its counsel made inquiries, so that GLCC could decide whether a counteroffer was warranted, whether such a counteroffer would be accepted, if made, and whether GLCC should simply accept AT & T's June 26, 2015, Offer without making a counteroffer. GLCC points out that courts and commentators have explained that inquiries, even about the possibility of different terms, are not counteroffers. GLCC also contends that any conclusion that it made a counteroffer during the discussion is contrary to the parties' clear course of conduct of exchanging counteroffers only in writing, not orally.

AT & T argues that, by stating its approval of the structure of AT & T's June 26, 2015, Offer, but with three new price terms, GLCC proposed a "substituted bargain," and thus made a counteroffer to AT & T that terminated GLCC's ability to accept AT & T's June 26, 2015, Offer. AT & T argues that the different price terms proposed by GLCC were plainly material and indisputably would have increased the cost of any settlement to AT & T. AT & T also points out that, during the discussion, GLCC's counsel did not disclaim the intent to make a counteroffer, state that the proposed terms were terms that GLCC would accept if AT & T were to offer them, or otherwise state that GLCC was continuing to consider AT & T's June 26, 2015, Offer on its original terms. AT & T contends that, under basic contract principles, such a counteroffer terminated GLCC's ability to accept AT & T's June 26, 2015, Offer. AT & T contends that GLCC's contrary contentions do not withstand scrutiny. More specifically, AT & T contends that, unlike prior communications, GLCC's discussion of different terms was not couched in conditional language; the parties had never taken the position that offers or counteroffers could only be made in writing, and such a requirement was unrealistic in light of the urgency of the timing of the discussion on the eve of trial; and it would have made no sense for GLCC to expect AT & T to "bid against itself," where AT & T had just made a counteroffer.

In reply, GLCC reiterates that the circumstances do not show that it made a counteroffer, only an inquiry about the possibility of other terms. Indeed, GLCC argues that its suggestion of specific terms was by way of example of what a "split the difference" settlement might look like in response to Mr. Hunseder's request for such an example. Thus, GLCC argues that the last offer made was AT & T's June 26, 2015, Offer, and GLCC accepted that Offer later by e-mail, before the original deadline and before that Offer was revoked.

### b. Analysis

 This dispute requires me to distinguish among an "acceptance," a "counteroffer," and an "inquiry." The requirements for an "acceptance" essentially mirror the requirements for an "offer": "Acceptance of the offer is indicated by a manifestation of assent to the terms of the offer made by the party to whom it is addressed in a manner invited or required by the offer." *Pavone v. Kirke*, 801 N.W.2d 477, 488 (Iowa 2011). "[T]he acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever." *Rick*, 706 N.W.2d at 724. If there is any deviation, "there is no mutual assent and therefore no contract." *Id.* The acceptance must also be communicated or delivered to the offeror; a private, uncommunicated assent does not make a contract. *Heartland*, 631 N.W.2d at 270. Furthermore, " '[t]he offeror is the master of his offer; just as the making of any offer at all can be avoided by appropriate language or other conduct, so the power of acceptance can be narrowly limited.' " *Blackford v. Prairie Meadows Racetrack and Casino, Inc.*, 778 N.W.2d 184, 190 (Iowa 2010) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 29, cmt. a, at 83).

 In contrast to an "acceptance," a "counteroffer" is effectively a rejection of the prior offer. *See L & L Builders Co. v.* *Quirk*, 782 N.W.2d 169, 2010 WL 1052073, *4 (Iowa Ct.App.2010) (table op.). As § 36 the RESTATEMENT (SECOND) OF CONTRACTS explains, one of the methods of termination of the power of acceptance is a "counteroffer by the offeree." RESTATEMENT (SECOND) OF CONTRACTS § 36(a); *see also id.* § 39(2) ("An offeree's power of acceptance is terminated by his making of a counteroffer, unless the offeror has manifested a contrary intention or unless the counteroffer manifests a contrary intention of the offeree"). Section 39(1) of the RESTATEMENT (SECOND) OF CONTRACTS defines a "counter-offer" as "an offer made by an offeree to his offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer." *See also* RESTATEMENT (SECOND) OF CONTRACTS § 59 ("A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer."). Thus, for example, where a party's response to an offered settlement agreement makes "edits" or changes to the offer proposed by the other party, the responding party has "essentially made a counter-offer." *See Rector v. Falbo*, 786 N.W.2d 519, 2010 WL 2080117, *3 (Iowa Ct.App.2010) (table op.) (citing RESTATEMENT (SECOND) OF CONTRACTS § 59).

 GLCC is correct, however, that a mere "inquiry" about different or better terms does not necessarily amount to a counteroffer. As comment *b* to RESTATEMENT (SECOND) OF CONTRACTS § 39 explains,

A mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer, is ordinarily not a counteroffer. Such responses to an offer may be too tentative or indefinite to be offers of any kind; or they may deal with new matters rather than a substitution for

the original offer; or their language may manifest an intention to keep the original offer under consideration.

RESTATEMENT (SECOND) OF CONTRACTS § 39, cmt. b. The comment then provides the following "Illustration" of this principle:

A makes the same offer to B as that stated in Illustration 1, and B replies, "Won't you take less?" A answers, "No." An acceptance thereafter by B within the thirty-day period [specified in the offer] is effective. B's inquiry was not a counter-offer, and A's original offer stands.

RESTATEMENT (SECOND) OF CONTRACTS§ 39, Illustration 2.

As I explained in my Findings Of Fact, above, Mr. Hunseder apparently believed that GLCC was making a counteroffer that included specific, different amounts to settle the outstanding dispute and for "baseline" traffic during the first and second years going forward. Because Mr. Hunseder may have sincerely believed that GLCC had made a counteroffer, I invited the parties to submit letter briefs on the question of the effect of a recipient's subjective belief that he received a counteroffer. As I also explained, above, in Section II.B.3.b., in their post-hearing letter briefs, the parties agree that the standard in deciding whether an offer or counteroffer has been made is an objective one, not a subjective one, citing, *inter alia*, *Phipps*, 558 N.W.2d at 203 ("We look for the existence of an offer objectively, not subjectively."); *Anderson*, 540 N.W.2d at 285; *Fairway Ctr. Corp.*, 502 F.2d at 1140; and *Kopple*, 447 F.Supp.2d at 974. Thus, Mr. Hunseder's sincere, but subjective, belief, if any, that GLCC made a "counteroffer" during the June 26, 2015, conference call simply is not relevant to the determination of whether or not GLCC actually made a counteroffer, under the controlling "objective" standard.

■ Viewed from the proper "objective" perspective, I find that GLCC did not make a counteroffer, but only made inquiries about the possibility of better terms. Certainly, no one testified that, during the June 26, 2015, conference call, anyone ever described GLCC's suggestion of specific terms as a "counteroffer." It is true, as AT & T contends, that Mr. Carter and Mr. Bowser did not expressly disclaim the intent to make a counteroffer, state that the proposed terms were terms that GLCC would accept if AT & T were to offer them, or otherwise state that GLCC was continuing to consider AT & T's June 26, 2015, Offer on its original terms. It is also true that, on June 25, 2015, when GLCC made a written suggestion of a "framework," with certain specific pricing terms, GLCC expressly stated, "Please note that GLCC is not proposing the specific rates in our attachment and this does not constitute a formal settlement offer from GLCC to AT & T. Rather, it should be an [sic] understood as an example framework that might help to progress the discussions." Joint Exhibit 7 (e-mail and attachment from Mr. Carter to Mr. Hunseder and Mr. Bendernagel). Nevertheless, I credit Mr. Bowser's testimony that it simply had not occurred to him, prior to his telephone conversation with Mr. Bendernagel on the evening of June 26, 2015, that anyone would have understood GLCC's discussion of a "split the difference" approach, or specific terms as an illustration of what such an approach might look like, during the conference call as a counteroffer. I also find Mr. Bowser's view of the discussion to be objectively reasonable, under all of the circumstances, so that there was no reasonable necessity for GLCC's attorneys to disclaim an intent to make a counteroffer during the June 26, 2015, conference call. The presence of a "boilerplate" disclaimer, in written correspondence giving an example of terms in a possible settle-

ment scheme, certainly would not surprise a "normally constituted person." *See Rucker*, 828 N.W.2d at 602 (explaining that circumstances surrounding alleged creation of a contract are viewed from the perspective of "a normally constituted person"). Even after the presence of such a disclaimer in written correspondence, the absence of a disclaimer in an oral discussion, on the eve of trial, of another example of possible terms in another settlement scheme, would not surprise a "normally constituted person."

More specifically, from the evidence presented at the hearing, I find that, during the June 26, 2015, conference call, GLCC's attorneys were asking Mr. Hunseder whether the June 26, 2015, Offer was AT & T's last, best offer. Mr. Carter's and Mr. Bowser's inquiries, including their suggestion of specific terms, was tantamount to asking, "Won't you take less?" or, more precisely, "Won't you give more?" which, in context, was "an inquiry," and "not a counter-offer, and [AT & T's] original offer st[oo]d[ ]." RESTATEMENT (SECOND) OF CONTRACTS § 39, Illustration 2. Viewing the circumstances from the perspective of "a normally constituted person," GLCC's discussion of specific terms was an illustration of what a "split the difference" approach might look like, offered in response to Mr. Hunseder's request for such an illustration or clarification of what a "split the difference" approach might look like. Thus, I find that the discussion was "[a] mere inquiry regarding the possibility of different terms, a request for a better offer, or a comment upon the terms of the offer," and, as such, was "not a counter-offer." RESTATEMENT (SECOND) OF CONTRACTS § 39, cmt. *b*. I find that the language and circumstances of the discussion of the different terms "manifest[ed] an intention to keep the original offer under consideration." *Id.*

Thus, in the alternative—that is, if, contrary to my conclusions above, the June 26, 2015, Offer was complete and an agreement based on that Offer was not contingent upon execution of a writing—I find that GLCC's inquiry about different or better terms in the conference call concerning AT & T's June 26, 2015, Offer did not terminate that Offer or cut off GLCC's ability to accept it. In those circumstances, AT & T's June 26, 2015, Offer still stood, *see id.* cmt. *b* and Illustration 2, and GLCC could validly accept it.

Also in the alternative—that is, if, contrary to my conclusions above, the June 26, 2015, Offer was complete and an agreement based on that Offer was not contingent upon execution of a writing—I find that GLCC's "acceptance," in the e-mail from Mr. Carter to Mr. Hunseder at 5:12 p.m. CDT on June 26, 2015, *see* Joint Exhibit 9, was valid and effective. The acceptance was prior to the deadline of June 29, 2015, set in the June 26, 2015, Offer. *See Blackford*, 778 N.W.2d at 190 (explaining that an offeror may "narrowly limit" the power of acceptance (quoting RESTATEMENT (SECOND) OF CONTRACTS § 29, cmt. a, at 83)). Thus, the June 26, 2015, Offer had not terminated at the time of acceptance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 36(1)(b) (explaining that an offer may be terminated, *inter alia*, by "lapse of time"). Also, because the acceptance stated only, "Great Lakes accepts AT & T's latest offer," *see* Joint Exhibit 9, the acceptance conformed strictly to the June 26, 2015, Offer, in all its conditions, without any deviation or condition whatever. *Rick*, 706 N.W.2d at 724. Under this alternative, the parties *do* have a valid and enforceable settlement agreement on the terms of the June 26, 2015, Offer.

## III. CONCLUSION

While the stakes in this litigation are high, and the parties battled zealously,

they were extremely professional. All of the lawyers approached the issue of whether there had been a binding settlement agreement with the utmost good faith, civility, and superb preparation. When ten million dollars are so nearly in a party's grasp, it might be easy to over-reach on the law and embellish the facts. That did not happen. All of the lawyers in this case, including the three who testified, demonstrated the highest ethical and professional aspirations of the legal profession. Ultimately, however, I must decide the issues, and someone must lose.

THEREFORE, upon the foregoing,

1. In the first instance, GLCC's July 9, 2015, Motion To Enforce Settlement Agreement (docket no. 188) is **denied**; but

2. In the alternative—that is, if, contrary to my conclusions above, the June 26, 2015, Offer was complete and an agreement based on that Offer was not contingent upon execution of a writing—GLCC did *not* make a counteroffer; GLCC's acceptance of the June 26, 2015, Offer was valid and effective; and GLCC's July 9, 2015, Motion To Enforce Settlement Agreement (docket no. 188) would be granted.

**IT IS SO ORDERED.**